Filed 12/6/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| C.S., | H045665 |
| Petitioner, | (Santa Clara County Super. Ct. Nos. JV38951, 213156) |
| v. | |
| THE SUPERIOR COURT OF SANTA CLARA COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |


## I.     INTRODUCTION

Petitioner C.S. was 15 years old when he participated in a gang assault on April 27, 2012, that resulted in the death of the 14-year-old victim.  As permitted by the versions of Welfare and Institutions Code sections 602 and 707[1] that were then in effect, the district attorney charged C.S. in a court of criminal jurisdiction,[2] rather than in juvenile court, with murder (Pen. Code, § 187), assault by means of force likely to produce great bodily injury (*id.*, § 245, subd. (a)(4)), and active participation in a street

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] We will hereafter refer to the court of criminal jurisdiction as "adult/criminal court" to distinguish it from juvenile court.

gang (*id.*, § 186.22, subd. (a)). The district attorney also alleged that C.S. committed the murder and assault for the benefit of a criminal street gang (*id.*, § 186.22, subd. (b)) and alleged a gang special circumstance (*id.*, § 190.2, subd (a)(22)). In August 2016, a jury convicted C.S. of the charged offenses and found true the special allegations.

On November 8, 2016, before C.S.'s sentencing hearing, the Public Safety and Rehabilitation Act of 2016 (Proposition 57) was passed. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303-304 (*Lara*).) The legislation took effect the next day, on November 9, 2016. (*Id.* at p. 304.) Among the statutory changes made by Proposition 57 were amendments to sections 602 and 707, which now provide that any allegation of criminal conduct against a person who was under age 18 at the time of the alleged offense must be filed in juvenile court in the first instance. (See §§ 602, 707, subds. (a)-(b).) There is no longer a presumption that a minor who was 14 or older when he or she allegedly committed certain offenses, including murder, is unfit for juvenile court. (See former and current §§ 602, 707.) Now if a prosecuting attorney wishes to try an accused minor as an adult, the prosecutor must file a motion in the juvenile court requesting that the juvenile court transfer the minor to adult/criminal court. (See § 707, subds. (a)-(b); Cal. Rules of Court, rule 5.766(a).[3])

After Proposition 57 took effect, C.S.'s case was sent back to juvenile court, where a retrospective transfer hearing was held.[4] After the hearing, the juvenile court ordered C.S., who was by then 21 years old, transferred to adult/criminal court. (See § 707, subd. (a)(1).)

In its written transfer order, the juvenile court made factual findings regarding each of the five criteria it was required to consider under section 707, subdivision (a)(2)

---

[3] All further rule references are to the California Rules of Court.

[4] In *Lara*, *supra*, 4 Cal.5th at page 309, the California Supreme Court confirmed that Proposition 57 effected "an 'ameliorative change[ ] to the criminal law' " that applied to cases pending at the time it was enacted.

(hereafter section 707(a)(2)).**[5]**  We can reasonably infer from its statements that the juvenile court found that C.S.'s potential for rehabilitation prior to the expiration of the juvenile court's jurisdiction (§ 707(a)(2)(B)(i)) and the circumstances and gravity of the offense (§ 707(a)(2)(E)(i)) weighed in favor of transfer and that C.S.'s previous delinquent history (§ 707(a)(2)(C)(i)) weighed against transfer.  We are unable to discern from the juvenile court's transfer decision whether the court found that the degree of criminal sophistication exhibited by C.S. (§ 707(a)(2)(A)(i)) and the success of previous attempts to rehabilitate C.S. (§ 707(a)(2)(D)(i)) weighed in favor of transfer, against transfer, or were neutral.  The juvenile court concluded its transfer order by stating: "After considering all of the judicial transfer factors and evidence presented and considering it in a totality of the circumstances review, this court finds that the People have met its burden of proof by a preponderance of the evidence and grants the People's request to transfer [C.S.'s] case to a court of general criminal jurisdiction."

C.S. filed a petition for writ of mandate in this court challenging the juvenile court's order transferring his case to adult/criminal court.  In his petition, C.S. contends the juvenile court "abused its discretion by misstating facts, overlooking critical evidence, and misapplying relevant standards."  After we issued an order to show cause, the Attorney General filed a return, and C.S. filed a reply.**[6]**

---

**[5]** Section 707(a)(2) requires the juvenile court to consider:  "[t]he degree of criminal sophistication exhibited by the minor" (§ 707(a)(2)(A)(i)); "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707(a)(2)(B)(i)); "[t]he minor's previous delinquent history" (§ 707(a)(2)(C)(i)); "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707(a)(2)(D)(i)); and "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707(a)(2)(E)(i)).

**[6]** We subsequently asked for supplemental briefing on a number of issues, including whether, in order to permit meaningful appellate review, the juvenile court was required to make specific findings as to which of the five section 707(a)(2) criteria weighed in favor of transfer, against transfer, or neither in favor of or against transfer; (continued)

For reasons that we shall explain, we conclude that the juvenile court's transfer decision does not permit meaningful appellate review because the juvenile court did not clearly and explicitly "articulate its evaluative process" by detailing "how it weighed the evidence" and by "identify[ing] the specific facts which persuaded the court." (*In re Pipinos* (1982) 33 Cal.3d 189, 198 (*Pipinos*).) In addition, and of particular importance to our decision, is the recent amendment to section 1769, which allows C.S. to be held in the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF) until he reaches age 25. We are unable to discern from the juvenile court's order whether the court would have reached a different conclusion regarding transfer had the law provided at the time of the transfer hearing that C.S. could be held in DJF until age 25. Thus, because the juvenile court did not clearly and explicitly "articulate its evaluative process" (*Pipinos*, *supra*, at p. 198), and given the recent change to section 1769 extending the time C.S. could be held in DJF, we will issue a peremptory writ of mandate commanding respondent court to vacate the challenged transfer order and make further findings regarding the section 707(a)(2) criteria.

---

whether the district attorney had the burden of proving each of the section 707(a)(2) criteria by a preponderance of the evidence; and whether there is a reasonable probability that the juvenile court would have made a different decision had it known that C.S. could be held in the Department of Corrections and Rehabilitation, Division of Juvenile Facilities until he attained the age of 25, pursuant to a recent amendment to section 1769, subdivision (d)(2).

We also asked for supplemental briefing on the effect of Senate Bill 1391 (2017-2018 Reg. Sess.), which amends section 707, effective January 1, 2019, to eliminate a district attorney's authority to bring a transfer motion in a case in which a minor was 14 or 15 years of age at the time of the offense, unless the individual was not apprehended prior to the end of juvenile court jurisdiction. After the district attorney filed an amicus brief arguing that Senate Bill 1391 was an unconstitutional amendment of Proposition 57, we asked for supplemental briefing on whether that issue was ripe and whether the district attorney was correct.

## II.    BACKGROUND

### A.    *The Charged Offenses*[7]

The charges arose from an incident on April 27, 2012, at Roosevelt Park in San Jose. The park was in Norteño gang territory and was claimed by the Roosevelt Park Locos (RPL) gang. C.S. was 15 years old at the time.

The 14-year-old victim, Heriberto R., went to the park at about 6:30 p.m. to play basketball with his older brother, his father, and his uncle. Heriberto was wearing blue shorts.

C.S. was at the park along with several members of the RPL, including Victor Villar, who was the gang's shot-caller. Villar signaled to C.S. and another gang member to confront Heriberto. Villar also told a third gang member to "go."

C.S. and the two other gang members approached Heriberto, asking, "Do you bang?" Heriberto "looked like he was confused." One of C.S.'s companions lifted Heriberto's shirt to look for tattoos but did not see any.

Heriberto's older brother approached and said, "Leave my little brother alone. He doesn't play that stuff. He doesn't bang." However, one of C.S.'s companions said, "Bullshit. You're a fucking scrap," referring to Heriberto's apparel.

One of C.S.'s companions then punched Heriberto, causing him to fall to the ground. C.S. and other gang members punched, kicked, and stomped on Heriberto's head. C.S. was the last person to stop stomping on Heriberto's head. The group of gang members also punched Heriberto's brother. Heriberto suffered a skull fracture and died.

Prior to the incident, C.S. sent a text message to someone stating that he was "coming up for Roosevelt." After the incident, C.S. indicated he did not want to discuss

---

[7] The facts of the offenses are taken from the probation officer's report, the testimony at the transfer hearing, and the grand jury proceedings.

the incident in text messages.  Also after the incident, C.S. was given gang member status in the RPL.

**B.**     *Procedural History*

In August 2013, the district attorney obtained a grand jury indictment charging C.S. with murder (Pen. Code, § 187), assault by means of force likely to produce great bodily injury (*id.*, § 245, subd. (a)(4)), and active participation in a criminal street gang (*id.*, § 186.22, subd. (a)).  The indictment, which was filed in adult/criminal court, alleged that C.S. committed the murder and assault for the benefit of a criminal street gang (*id.*, § 186.22, subd. (b)).  The indictment also alleged a gang special circumstance (*id.*, § 190.2, subd. (a)(22)).

The case proceeded to trial in adult/criminal court, and a jury found C.S. guilty of the charged offenses and found true the special allegations.  Prior to the sentencing hearing, however, Proposition 57 passed, and the case was sent back to juvenile court for a retrospective transfer hearing.

A transfer report (§ 707, subd. (a)(1)) was prepared by a probation officer, who recommended the case be transferred to adult/criminal court.  C.S. presented the following documents to the juvenile court:  (1) the report of a psychologist who opined that C.S. should not be transferred to adult/criminal court; (2) the report of a neuropsychologist who concluded that C.S. suffered from brain dysfunction and other psychological problems that affected his decision-making; (3) the report of a gang expert who opined that C.S. was not a gang member; (4) records from the Department of Family and Children's Services; and (5) the transcripts from the grand jury hearing.

At the transfer hearing held in January 2018, when C.S. was 21 years old, the district attorney presented testimony from the probation officer who prepared the transfer report.  C.S.'s witnesses included the psychologist, various character witnesses, and himself.  We review the evidence below.

6

**C.      *The People's Evidence***

The probation officer who prepared the transfer report was deemed an expert in the evaluation of juvenile offenders and their fitness to remain in the juvenile justice system.  She had reviewed the police reports and grand jury testimony, and she had interviewed C.S. and his family.  The probation officer had also reviewed reports from C.S.'s time in juvenile hall and in jail.

C.S.'s criminal history began in September 2010, at age 14, when he was found in possession of tobacco products and ran from the police.  Following that incident, C.S. was referred to a gang intervention program.  In May 2011, C.S. was found in possession of marijuana, and he was sent a "reprimand letter."  In July 2011, C.S. was contacted with other gang members in Roosevelt Park.

Although the incident leading to the charged offenses occurred in April 2012, C.S. was not arrested on those charges until September 2012.

In May 2012, C.S. was declared a ward of the juvenile court after being charged with a February 2012 burglary and vehicle theft, and he was ordered to participate in services and wear an electronic monitor.  C.S. was subsequently terminated from his substance abuse program for failure to attend, and he cut off the electronic monitor and absconded.

C.S.'s educational history included 26 suspensions from school.  While in custody, however, he received a high school diploma.

The probation officer believed that C.S. had shown criminal sophistication by indicating he was aware of the dangers of discussing the murder in text messages.  The probation officer also believed that an average youth who had a similar history would not have committed such a violent, unprovoked act.

The probation officer noted that C.S., who was 21 years old at the time of the transfer hearing, could only be held in DJF until age 23.  In her opinion, that was not enough time for the DJF to properly rehabilitate C.S.  If C.S. were sent to adult prison, he

would have access to educational programs, cognitive behavioral treatment, and other programs. If C.S. remained under juvenile court jurisdiction, he would be subjected to a "risk and needs assessment" to determine appropriate programming, which could include cognitive behavior therapy and "an intensive nine module gang intervention program."

The probation officer opined that the prior attempts to rehabilitate C.S. had been "[u]nsuccessful."

The probation officer testified about the circumstances of the offense. She acknowledged C.S.'s childhood exposure to drugs and violence but believed that someone else in similar circumstances would not have committed such an act.

C.S. had refused to talk to the probation officer about the offense, even though he had already been convicted. C.S. told her that all the witnesses against him had lied and that he had been wrongfully convicted. He acknowledged having previously worn a maroon belt with XIV on it, but he claimed the belt was not gang-related. After the homicide, C.S. began referring to himself as "Savage," indicating he had received notoriety for the crime.

### D. *The Defense Evidence*

#### 1. The Psychologist

Clinical and forensic psychologist Rahn Minagawa had evaluated C.S. in 2013, 2014, and 2017. C.S. had been exposed to drugs in utero and had been placed in protective custody at birth due to methamphetamine exposure. His childhood experiences included exposure to his mother's drug use and to domestic violence. He was cared for by a grandmother who was a schizophrenic and who had kicked him out at age five. When C.S. was eight, his older brother was killed, causing C.S. to suffer from depression, which manifested as anger. He gravitated toward a gang, which provided him with stability.

Minagawa had diagnosed C.S. with "other specified trauma and stressor-related disorder," in addition to cannabis-use disorder and child neglect.

8

Minagawa did not think C.S. had exhibited criminal sophistication. A 15-year-old's brain is not well-developed. C.S.'s development would have been even more delayed by his childhood history. The presence of peers and the "emotionally charged situation" would also have compromised his decision-making. His exposure to trauma would have made him hypervigilant.

According to Minagawa, C.S. had participated in programming "of his own volition" while incarcerated, showing that he was making better decisions and becoming rehabilitated. Minagawa believed that C.S. could be rehabilitated in the next two years in DJF. DJF had programs to address substance abuse and trauma recovery, life skills programs, and individual and group therapy.

Over the years, Minagawa had observed C.S. grow and mature. However, C.S. still had not accepted responsibility for his crime, which interfered with his ability to be rehabilitated.

### 2. C.S.

C.S. began hanging out in Roosevelt Park when he was about 11 or 12 years old. He knew that gang members hung out there, and he considered himself a Northerner, but he did not want to be a gang member. His friends at the park were like family; they helped him feel safe at a time when he had no one else to look out for him.

C.S. claimed he did not remember what happened before the assault, other than "getting hit." He did not remember stomping on Heriberto's head. However, he accepted responsibility for what happened to Heriberto and felt that Heriberto did not deserve to be assaulted or killed.

C.S. had learned "that violence doesn't solve anything." He provided an example of an incident in juvenile hall, during which he was assaulted but did not fight back. Through in-custody programs, he had learned to walk away from situations and put himself in other people's shoes.

9

C.S. had enjoyed the probation services he was receiving prior to his arrest for the homicide, but after his sister stopped providing him with transportation, he had gone "back to the streets."

C.S. did not want to "live the way [he] used to." He therefore was taking the initiative to engage in programs and apply the tools he was learning. If released, he planned to move to Oregon, surround himself with family, get a job, and go to school.

C.S. asserted that at his criminal trial, his codefendants had lied and blamed him for things they had done. He also believed he was wrongly convicted due to an issue with a juror who was dismissed during the trial. C.S. denied that his text message about "coming up for Roosevelt" was gang-related. He also denied that his maroon XIV belt or his "408" tattoo indicated he was a gang member.

### 3. Other Witnesses

Michael Kubba, a volunteer counselor at juvenile hall, met C.S. in 2013. Kubba continued to visit C.S. after C.S. was moved to the main jail. He developed a mentoring relationship with C.S., who seemed to be mature and future-oriented. C.S. was interested in helping children and starting a nonprofit.

Ra Amen, a chaplain in juvenile hall and the jails, met C.S. in 2012. C.S. had consistently expressed a desire to change his life and had been dedicated to helping other inmates.

Lynne Lukenbill, a chaplain for the jail, met C.S. in 2015. C.S. never missed her services and was a positive role model.

Rose Luerra, a school youth intervention specialist, met C.S. in 2007 when he was 11 years old. C.S. had participated in anger management, gang awareness, life skills, and cognitive programming at that time. Luerra also worked with C.S. at juvenile hall. C.S. reached out to her, and she provided him with counseling for about four and a half years. C.S. wanted to disassociate from gangs and improve his life.

10

Brenda Torres was C.S.'s cousin. She lived in Oregon and was willing to have C.S. live with her. C.S. could attend a local community college and find work there. Her family would provide C.S. with a positive support group.

Diana Villarreal, C.S.'s sister, had become C.S.'s legal guardian when she was 19 years old. After their older brother died, their mother got "lost on drugs," their grandmother's schizophrenia worsened, and C.S. was often on his own. She believed that since his arrest, C.S. had matured.

Deacon Ruben Solorio met C.S. in 2013 in juvenile hall. C.S. was trying to deepen his relationship with God and become a better person. Unlike many youth in juvenile hall who typically were not genuine in saying they wanted to change, C.S. seemed very sincere.

Angela Haick's report was submitted in lieu of testimony. She was the principal of the school at juvenile hall. C.S. had initially been angry and reluctant to participate, but he began developing cognitive skills and receiving mentoring, which "transformed" him "into a kind, caring and hard working student."

Jesse De La Cruz, a gang expert, also submitted a report to the juvenile court in lieu of testimony. De La Cruz opined that C.S. was not a gang member based on C.S.'s insignificant criminal history, which did not include crimes of violence or drug-related offenses, his lack of tattoos, and his school record, which did not include serious behavioral problems or truancy. It was also noteworthy to De La Cruz that there was no evidence C.S. took credit for Heriberto's murder.

### E. *The Juvenile Court's Findings and Decision*

In a written order, the juvenile court determined: "After considering all of the judicial transfer factors and evidence presented and considering it in a totality of the circumstances review, this court finds that the People have met its burden of proof by a preponderance of the evidence and grants the People's request to transfer [C.S.'s] case to

11

a court of general criminal jurisdiction." The juvenile court reviewed all five of the criteria set forth in section 707(a)(2).

### 1.    Criminal Sophistication (§ 707(a)(2)(A)(i))

With respect to C.S.'s degree of criminal sophistication (§ 707(a)(2)(A)(i)), the juvenile court considered C.S.'s early childhood, brain development, prior offenses, and gang involvement.[8]  The court observed that C.S. "had a rough start in life" as he "was born positive for methamphetamines" and was "in and out of foster care" until age 6, when he was then cared for by his older brother who was later killed.  The court detailed the testimony it heard from Minagawa regarding his opinion that C.S.'s brain was not fully developed at the time of the offense, which lessened C.S.'s ability to consider the consequences of his actions and exercise impulse control.  The court stated that "[i]t is clear that . . . [C.S.] . . . suffer[ed] trauma" from his unstable childhood.  The court also noted the testimony it heard regarding a concussion C.S. had suffered as a child, "which may have affected his brain," and recognized that "older gang members . . . may have been 'shot callers' [who] most likely affected [C.S.'s] decision to join in the attack on Heriberto."

The juvenile court found that C.S. "does not have much by the way of juvenile offenses," and listed C.S.'s police contacts and the citations he received as a 14-year-old for misdemeanor possession of marijuana (Health & Saf. Code, § 11357) and being a minor in possession of alcohol (Bus. & Prof. Code, § 25662), which resulted in letters of reprimand from the probation department.  The court observed that C.S. was also cited for residential burglary and stealing a car when he was 14, "both felonies for which [a

---

[8] Although the court mentioned the charged offense when weighing this criterion, stating that it "was a vicious and unprovoked attack on an innocent teen," it considered the charged offense in its evaluation of the section 707(a)(2)(E)(i) criterion, the circumstances and gravity of the offense.

petition] was filed in [the juvenile] court."[9]  In addition, the court noted that C.S.'s fingerprints had been found on a stolen car but charges were not filed because the statute of limitations had run.

Regarding C.S.'s gang involvement, the juvenile court found that "[C.S.] was identified as a person who was hanging around Roosevelt Park and [the RPL] when he was 14 years old."  The court also detailed the gang-related evidence it heard regarding the charged offense, such as that when the group approached Heriberto, they asked whether he belonged to a gang and then lifted his shirt to search for tattoos.  The court found that although C.S. was placed in a maximum-security jail unit due to his association with the RPL and the serious charges he faced, he had been cooperative in jail, had exhibited positive behavior, and had not had any gang-related incidents.  The juvenile court also stated that it had considered De La Cruz's opinion that C.S. was not a gang member because he had never been suspended at school and did not exhibit any behavioral problems there.

Finally, the juvenile court stated that it had considered the district attorney's evidence that when C.S. was asked by text a few days after the incident whether he was made a member of the RPL, "[C.S.] was sophisticated enough to not answer such a question in writing."

The juvenile court did not explicitly state whether this criterion weighed in favor of or against transfer to adult/criminal court, or whether it found this criterion to be neutral.

### 2. Likelihood of Rehabilitation During Juvenile Court Jurisdiction (§ 707(a)(2)(B)(i))

With respect to whether C.S. could be rehabilitated before the expiration of the juvenile court's jurisdiction (§ 707(a)(2)(B)(i)), the juvenile court found that DJF

---

[9] The juvenile court noted that this petition "was dismissed as [C.S.] was being prosecuted in adult court."

13

"typically needs approximately 7 years to rehabilitate a youthful offender" adjudicated of "a Category One offense" such as murder. The court observed that C.S. was 21 years old and that DJF could not keep offenders past the age of 23. Based on DJF's intake and release procedures, the court determined that C.S. "would only have roughly 1 ½ years for actual programming" there. The juvenile court found that this was "simply not enough time for [C.S.] to rehabilitate before joining society."

Although the juvenile court did not explicitly state whether it found this criterion weighed in favor of or against transfer to adult/criminal court, or whether the criterion was neutral, we can reasonably infer from the juvenile court's order that the court found this criterion to weigh in favor of transfer to adult/criminal court.

### 3.    Prior Delinquent History (§ 707(a)(2)(C)(i))

With respect to C.S.'s previous delinquent history (§ 707(a)(2)(C)(i)), the juvenile court found that C.S. "had very few offenses in comparison with other youth of his age in similar circumstances." The juvenile court did not explicitly state whether this criterion weighed in favor of or against transfer to adult court, or whether it found this criterion to be neutral. However, we can reasonably infer that the juvenile court found this criterion to weigh against transfer to adult/criminal court.

### 4.    Previous Attempts at Rehabilitation (§ 707(a)(2)(D)(i))

With respect to the success of previous attempts to rehabilitate C.S. (§ 707(a)(2)(D)(i)), the juvenile court found that C.S. had not previously received many services from the probation department because his juvenile crimes were not very serious in nature. The court found that as a dependent ward C.S. had not taken advantage of the programs provided to him by the Department of Family and Children's Services. The juvenile court did not explicitly state whether this criterion weighed in favor of or against transfer to adult court, or whether it found this criterion to be neutral.

14

### 5. Circumstances and Gravity of the Offense (§ 707(a)(2)(E)(i))

With respect to the circumstances and gravity of the offense (§ 707(a)(2)(E)(i)), the juvenile court found that "the unprovoked murder of an unarmed innocent child is the most serious offense of all." The juvenile court further found: "Despite the fact that [C.S.] was a minor at the time of the attack, despite the fact that his brain was not fully developed, despite the fact that he himself had unresolved family issues, was a dependent ward of the court, and was born addicted to methamphetamine, [C.S.] knew what he was doing when he joined the others in attacking Heriberto. He knew what he was doing every time he punched Heriberto. He knew what he was doing every time he kicked Heriberto and he knew what he was doing when he stomped Heriberto. Most importantly, he knew that what he was doing, what they were doing, was wrong."

Although the juvenile court did not explicitly state whether it found this criterion weighed in favor of or against transfer to adult/criminal court, or whether the criterion was neutral, we can reasonably infer from the juvenile court's order that the court found this criterion to weigh in favor of transfer to adult/criminal court.

### 6. Decision

The juvenile court's order concluded: "After considering all of the judicial transfer factors and evidence presented and considering it in a totality of the circumstances review, this court finds that the People have met its burden of proof by a preponderance of the evidence and grants the People's request to transfer [C.S.'s] case to a court of general criminal jurisdiction."

## III.  DISCUSSION

### A.  *Proposition 57*

On November 8, 2016, the electorate passed Proposition 57, the "Public Safety and Rehabilitation Act of 2016," which took effect the following day and ended the practice of prosecutors charging juveniles with crimes directly in adult/criminal court. (*Lara*, *supra*, 4 Cal.5th at pp. 303-304.) Now, if a prosecuting attorney wishes to try a

minor as an adult, the action must be commenced in juvenile court and the juvenile court must conduct a transfer hearing to determine whether the matter should remain in juvenile court or be transferred to adult/criminal court. (*Id.* at p. 303.) Proposition 57 effected "an 'ameliorative change[ ] to the criminal law' " that must be applied to cases pending at the time it was enacted. (*Lara*, *supra*, at p. 309.)

As detailed below, section 707, subdivision (a) and rule 5.770 provide the procedures and standards under which a minor who is "alleged to be a person described in Section 602" may be transferred to adult/criminal court. (§ 707, subd. (a)(1).) The statute permits a transfer motion as to a minor who was 16 years of age or older when he or she allegedly violated "any felony criminal statute," and it permits a transfer motion as to a minor who was age 14 or 15 when he or she allegedly committed "an offense listed in subdivision (b)." (*Ibid.*) "[T]he burden of proving that there should be a transfer of jurisdiction to criminal court jurisdiction is on the petitioner, by a preponderance of the evidence." (Rule 5.770(a); see also *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 715 (*J.N.*).) Neither section 707 nor rule 5.770 explicitly requires the prosecuting attorney to prove each of the section 707(a)(2) criteria by a preponderance of the evidence.

### 1. Transfer Criteria

The juvenile court must "consider" five criteria when determining whether a case should remain in juvenile court or be transferred to adult/criminal court. (§ 707(a)(2).)

The first criterion is the degree of criminal sophistication exhibited by the minor. (§ 707(a)(2)(A)(i).) Section 707(a)(2)(A)(ii) specifies that when evaluating criminal sophistication, "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or

16

peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication."

The second criterion is whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. (§ 707(a)(2)(B)(i).) Section 707(a)(2)(B)(ii) specifies that when evaluating a minor's potential for rehabilitation during the juvenile court's jurisdiction, "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature."

The third criterion is the minor's previous delinquent history. (§ 707(a)(2)(C)(i).) Section 707(a)(2)(C)(ii) specifies that when evaluating the minor's delinquency history, "the juvenile court may give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior."

The fourth criterion is the success of previous attempts by the juvenile court to rehabilitate the minor. (§ 707(a)(2)(D)(i).) Section 707(a)(2)(D)(ii) specifies that when evaluating previous rehabilitation attempts, "the juvenile court may give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs."

The fifth criterion is the circumstances and gravity of the offense alleged to have been committed by the minor. (§ 707(a)(2)(E)(i).) Section 707(a)(2)(E)(ii) specifies that when evaluating the circumstances and gravity of the offense, "the juvenile court may give weight to any relevant factor, including but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development."

17

### 2. Transfer Decision

If after consideration of the five transfer criteria, the parties' relevant evidence, and the mandatory probation report on the minor's behavioral patterns and social history, the juvenile court "orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes." (§ 707(a)(2).) The juvenile court must also set a date for the minor to appear in adult/criminal court. (Rule 5.770(d)(2).) If the juvenile court denies the transfer motion, a jurisdiction hearing must be held. (Rule 5.770(d)(1).)

### 3. Writ Review

Both parties—the minor and the prosecuting attorney—may seek appellate review of the juvenile court's ruling, by way of petition for extraordinary writ. (Rule 5.770(d)(3).) If the prosecutor intends to seek writ review, the prosecutor may obtain a continuance of the jurisdiction hearing. (Rule 5.770(e).)[10] If the minor intends to seek writ review, the minor must file the petition "no later than 20 days after the [minor's] first arraignment on an accusatory pleading" in adult/criminal court. (Rule 5.770(g).)

On writ review, the appellate court reviews the juvenile court's transfer decision under the abuse of discretion standard. (*J.N.*, *supra*, 23 Cal.App.5th at p. 714; see *People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 680 (*Jones*).) However, the juvenile court's findings of fact are reviewed for " 'substantial evidence,' " which is evidence " ' "reasonable in nature, credible, and of solid value." ' " (*Jones*, *supra*, at p. 681 & fn. 3; see *J.N.*, *supra*, at p. 714.)

---

**[10]** Rule 5.770(e) provides: "If the prosecuting attorney informs the court orally or in writing that a review of the court's decision not to transfer jurisdiction to the criminal court will be sought and requests a continuance of the jurisdiction hearing, the court must grant a continuance for not less than two judicial days to allow time within which to obtain a stay of further proceedings from the reviewing judge or appellate court."

**B.** *Analysis*

In his petition for writ of mandate, C.S. contends that the juvenile court's transfer decision was an abuse of discretion because the court misstated facts, failed to acknowledge certain evidence, and applied erroneous legal standards. C.S. also asserts in supplemental briefing that the juvenile court's transfer decision does not permit meaningful appellate review because it "describes the evidence" but "le[aves] the parties to guess or infer" which criteria the court found to weigh in favor of transfer. C.S. argues that in order to permit meaningful appellate review, the juvenile court's decision must "clearly articulate" how the section 707(a)(2) criteria were analyzed and "used" to make the transfer decision. The Attorney General asserts that nothing in the statute requires the juvenile court to make specific findings as to which of the section 707(a)(2) criteria weighed in favor of transfer, against transfer, or neither in favor of or against transfer. The Attorney General does not address whether specific findings regarding how the juvenile court weighed the criteria are necessary to permit meaningful appellate review of a transfer decision.

While we agree with the Attorney General that section 707(a)(2) requires only that the juvenile court "recite the basis for its decision in an order entered upon the minutes," that does not end our analysis. Principles of due process require a statement of decision that "set[s] forth the basis for the order with sufficient specificity to permit meaningful review." (*Kent v. United States* (1966) 383 U.S. 541, 561 (*Kent*).)

In *Kent,* the United States Supreme Court considered a juvenile court order from Washington D.C. that directed a minor be tried as an adult. (*Kent*, *supra*, 383 U.S. at p. 546.) The statute at issue provided the juvenile court with discretion as to the factors to consider and the weight to accord those factors, but nothing in the statute provided "standards" for the juvenile court's decision. (*Id.* at p. 547.) Nevertheless, under principles of due process, the minor was entitled to "a statement of reasons." (*Id.* at p. 557.) The statement did not need to be "formal," but it did need to demonstrate that

19

the juvenile court had engaged in a "careful consideration" of the issue. (*Id.* at p. 561.) Additionally, the juvenile court's order should "set forth the basis for the order with sufficient specificity to permit meaningful review." (*Ibid.*)

Our Supreme Court has likewise recognized that a statutory requirement of a statement of reasons "seeks to ensure that the trial judge weighs the relevant considerations." (*Pipinos*, *supra*, 33 Cal.3d at p. 198 [reviewing denial of motion for bail on appeal].) An adequate statement of reasons is one in which the trial court "articulate[s] its evaluative process and show[s] how it weighed the evidence presented in light of the applicable standards. [Citation.]" (*Ibid.*) A statement of reasons is inadequate where "it does not identify the specific facts which persuaded the court" to reach its decision. (*Ibid.*) Without a statement of reasons detailing the lower court's "analytical process," an appellate court cannot determine whether the trial court properly exercised its discretion. (*Id.* at pp. 202-203; see *People v. Superior Court (Robert L.)* (1989) 213 Cal.App.3d 54, 63 [juvenile court's findings inadequate in part because the court did not "articulate [its] evaluative process in applying the required criteria to the facts thus found in light of the statutory presumption of unfitness"].)

As applied to a decision to transfer a minor to adult/criminal court under section 707(a)(2), we hold that the foregoing principles require a juvenile court to clearly and explicitly "articulate its evaluative process" by detailing "how it weighed the evidence" and by "identify[ing] the specific facts which persuaded the court" to reach its decision. (*Pipinos*, *supra*, 33 Cal.3d at p. 198.) In most cases, this requirement will be met where the juvenile court performs a factual analysis of the relevant factors as to each criterion—as the juvenile court did in this case—and then specifies the criteria that weighed in favor of transfer. Likewise, where the juvenile court decides *not* to transfer a minor to adult/criminal court under section 707(a)(2), the juvenile court should explain its evaluative process, typically by performing a factual analysis of the relevant factors as to each criterion and then specifying which criteria weighed against transfer. In all cases,

20

appellate review would be greatly assisted if the juvenile court states which of the section 707(a)(2) criteria weighed in favor of transfer, against transfer, or neither in favor of or against transfer.[11]

The juvenile court's transfer order in *J.N.*, *supra*, 23 Cal.App.5th 706 permitted meaningful appellate review. In *J.N.,* the juvenile court's order specified that three section 707(a)(2) criteria weighed against transfer to adult/criminal court: J.N.'s criminal sophistication, his prior delinquent history, and the prior attempts to rehabilitate him. (*J.N.*, *supra*, at pp. 713-714, 716-720.) The order also specified that two of the section 707(a)(2) criteria weighed in favor of transfer to adult/criminal court: the possibility of rehabilitation and the circumstances of the charged offense. (*J.N.*, *supra*, at pp. 713-714, 721-724.) The appellate court found that substantial evidence supported the juvenile court's findings as to the three section 707(a)(2) criteria that weighed against transfer to adult/criminal court. But the appellate court found no substantial evidence to support the juvenile court's findings that the other two criteria weighed in favor of transfer to adult/criminal court. Thus, the *J.N.* court concluded that the juvenile court had abused its discretion by ordering transfer. (*J.N.*, *supra*, at p. 724.)

Here, the juvenile court considered all five of the criteria set forth in section 707(a)(2) and found the district attorney had proved, by a preponderance of the evidence, that C.S. should be transferred to adult/criminal court. However, the juvenile court did not explicitly state which of the criteria weighed in favor of transfer to adult/criminal court, which of the criteria weighed against transfer, and which of the

---

[11] The current version of the California Judges Benchguide 117 recommends that juvenile court judges "use a ruling worksheet" and provides a sample worksheet. (Cal. Judges Benchguides, Benchguide 117, Juvenile Delinquency Transfer of Jurisdiction Hearing (CJER 2018), § 117.18.) The sample worksheet, provided in Appendix B of that Benchguide, recommends that as to each of the section 707(a)(2) criteria, the juvenile court make a ruling as to whether "the Petitioner [has/has not] met their burden" and whether each criterion "mitigates [for/against] transfer to adult court."

criteria were neutral. (Cf. *J.N.*, *supra*, 23 Cal.App.5th at p. 715 [juvenile court found that three criteria weighed against transfer and two criteria weighed in favor of transfer].) We therefore proceed to carefully review the juvenile court's statement of decision in order to determine whether the juvenile court adequately articulated its "evaluative process" of the section 707(a)(2) criteria so as to permit us to meaningfully review C.S.'s contentions. (*Pipinos*, *supra*, 33 Cal.3d at p. 202.)

### 1. Criminal Sophistication (§ 707(a)(2)(A)(i))

C.S. contends the juvenile court should have recognized that his "adolescent brain and trauma history" made him less criminally sophisticated. C.S. asserts that he "react[ed] emotionally during the crime" and that the crime was impulsive rather than planned, and thus did not show criminal sophistication.

C.S.'s argument presumes that the juvenile court found that his criminal sophistication weighed in favor of transfer to adult/criminal court. However, the juvenile court's order did not specify whether it found this criterion weighed in favor of transfer, against transfer, or was neutral, and there was evidence that would have supported each of those findings. On the one hand, C.S. was an aggressor in a gang confrontation. (Cf. *J.N.*, *supra*, 23 Cal.App.5th at p. 716 [shooting occurred during an unexpected struggle over a gun].) Additionally, after the offense, C.S. showed sophistication by indicating he was aware of the dangers of discussing the murder in text messages. On the other hand, factors such as age, upbringing, and childhood trauma indicated that C.S. was not particularly sophisticated. (See *id.* at p. 718.)

Ultimately, however, we are unable to determine from our review of the record how this criterion weighed in the juvenile court's analysis of whether to transfer C.S. to adult/criminal court. Although the juvenile court discussed relevant factors—such as C.S.'s early childhood, the expert testimony regarding C.S.'s brain development, C.S.'s prior offenses, and C.S.'s gang involvement—we do not know whether the juvenile court found that these factors showed criminal sophistication or weighed in favor of transfer.

Because the juvenile court did not clearly and explicitly explain whether it found that C.S. exhibited criminal sophistication or how the criminal sophistication factors weighed in its transfer decision, we are unable to meaningfully determine whether C.S.'s challenges to the juvenile court's findings have merit.

### 2. Likelihood of Rehabilitation During Juvenile Court Jurisdiction (§ 707(a)(2)(B)(i))

The juvenile court found that "[b]ecause of the serious and violent nature of the murder in this case" and the fact that C.S. was already 21 years old and could only be held at DJF until age 23, there was "simply not enough time for [C.S.] to rehabilitate" before the expiration of the juvenile court's jurisdiction. (See § 707(a)(2)(B)(i).)

C.S. sets forth several arguments in support of his claim that the juvenile court's finding was erroneous. He contends: (1) the juvenile court applied an incorrect legal standard by failing to consider C.S.'s progress and behavior in juvenile hall; (2) the district attorney failed to "provide any details about available programs" at DJF and whether those programs would rehabilitate him; and (3) the juvenile court failed to recognize that it could retain its jurisdiction over C.S. until he reached age 25 pursuant to section 607, subdivision (b).[12]  C.S. also points out that since the time of the transfer hearing, the law has changed, and he can now be held in DJF until the age of 25. (See § 1769, subd. (b).)  C.S. argues that if the juvenile court had known that he could be held in DJF for two additional years there is a reasonable likelihood that the juvenile court would have found that this criterion weighed against, or was neutral with respect to, transfer to adult court.  C.S. highlights that this was one of only two criteria that the juvenile court appears to have found to weigh in favor of transfer.

---

[12] Section 607, subdivision (b) provides:  "The court may retain jurisdiction over a person who is found to be a person described in Section 602 by reason of the commission of an offense listed in subdivision (b) of Section 707, until that person attains 25 years of age if the person was committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities."

The Attorney General argues that the juvenile court would not have found C.S. could be rehabilitated even if the court had known that C.S. could have spent "two more years in DJF." The Attorney General points out that C.S.'s "challenges" in terms of rehabilitation included his failure to take responsibility for his role in the offense.

We are able to meaningfully review the juvenile court's finding on this criterion— that it weighed in favor of transfer to adult/criminal court—and conclude that the juvenile court's determination was reasonable based on the law at the time. The record shows that C.S. needed substantial programming to ensure he would not return to the gang after being released from DJF, particularly in light of his failure to admit gang membership and his failure to acknowledge responsibility for the offense. The probation report expressed a specific concern about C.S.'s need for gang programming and about C.S.'s need to process his childhood trauma. The probation report also specified that it would take approximately three months to transfer C.S. to an intake facility and another month and a half for him to be evaluated, and that C.S. would be transferred out of DJF four months before turning 23 years old. In other words, by the time of the transfer hearing, C.S. had just under a year in which to actually participate in DJF programs.[13] Based on the record, we determine that substantial evidence supports the juvenile court's finding that more time was needed to ensure C.S.'s rehabilitation, particularly in light of the fact that he continued to deny any gang involvement.

However, we are unable to determine from the transfer decision whether the juvenile court would have reached a different conclusion had it known that C.S. could be retained in DJF until age 25, as there was evidence to support a finding that C.S. could be rehabilitated in an approximately four-year DJF commitment. The probation officer's

---

[13] C.S. was born in September 1996, so he would turn 23 years old in September 2019. The transfer hearing was held in January 2018, and the juvenile court ordered the case transferred to adult court on February 16, 2018—about a year and half before C.S. would turn 23.

transfer report specified that DJF would offer intensive gang programming, which C.S. needed, and it appeared to the youth intervention specialist based on her interactions with C.S. that C.S. wanted to disassociate from gangs. The defense psychologist testified that C.S. had shown progress while incarcerated, that C.S. could be rehabilitated within two years, and that DJF had programs to address C.S.'s needs. If the juvenile court had known that C.S. could spend more than three years in DJF, the juvenile court may reasonably have decided that C.S. could be rehabilitated prior to the expiration of its jurisdiction.

### 3. Prior Delinquent History (§ 707(a)(2)(C)(i))

The juvenile court found that C.S. "had very few offenses in comparison with other youth of his age in similar circumstances," and neither party challenges that finding. Although the court did not explicitly state that this factor weighed against transferring C.S. to adult/criminal court, we will infer that the court made such a finding.

### 4. Previous Attempts at Rehabilitation (§ 707(a)(2)(D)(i))

In its statement of decision, the juvenile court observed that C.S. had not received many services from the probation department before his current offense, and that those services were sufficient at the time because his prior crimes were not very serious. The juvenile court found that C.S. had been provided with interventions by the Department of Family and Children's Services, due to his status as a dependent, but that he did not take advantage of those programs. The juvenile court did not explicitly state whether this criterion weighed in favor of transfer, against transfer, or neither in favor of or against transfer.

C.S. contends the juvenile court overlooked evidence that the prior services offered to him were inadequate and evidence that showed he had very little opportunity to participate in prior services for reasons such as his lack of transportation. C.S. also argues that there was evidence that he was being helped by the juvenile hall services, which showed that continued programming would continue to help him. He contends

25

the juvenile court should have found that this criterion weighed against transfer to adult/criminal court.

Evaluating C.S.'s claim is difficult because we do not know how this criterion weighed in the juvenile court's analysis of whether to transfer C.S. to adult/criminal court. There was evidence that C.S. was provided some prior services, but not necessarily services adequate to address all his needs, and there was evidence that C.S. resisted some prior services but participated in others. Ultimately, however, because we are unable to determine from our review of the record how this criterion weighed in the juvenile court's analysis of whether to transfer C.S. to adult/criminal court, we cannot meaningfully review its findings.

### 5. Circumstances and Gravity of the Offense (§ 707(a)(2)(E)(i))

The juvenile court found that "the unprovoked murder of an unarmed innocent child is the most serious offense of all." The juvenile court noted that C.S. had joined the attack after Heriberto was "laid out on the ground." C.S. had kicked and punched Heriberto, and he had stomped on Heriberto's head even after all of the other attackers had begun to flee.

The juvenile court wrote: "Despite the fact that [C.S.] was a minor at the time of the attack, despite the fact that his brain was not fully developed, despite the fact that he himself had unresolved family issues, was a dependent ward of the court, and was born addicted to methamphetamine, [C.S.] knew what he was doing when he joined the others in attacking Heriberto. He knew what he was doing every time he punched Heriberto. He knew what he was doing every time he kicked Heriberto and he knew what he was doing when he stomped Heriberto. Most importantly, he knew that what he was doing, what they were doing, was wrong."

Although the juvenile court did not explicitly state that this criterion weighed in favor of transfer to adult/criminal court, we can infer that the juvenile court made such a finding, which C.S. challenges. C.S. contends the juvenile court erroneously "focused on

26

the harm caused" by his conduct rather than the circumstances: his youth, his childhood trauma, and the fact he was part of a group. The record clearly shows, however, that the juvenile court *did* consider those circumstances, and that the juvenile court explicitly weighed those circumstances against the circumstances of the offense itself.

We are able to meaningfully review the juvenile court's findings as to this criterion. The circumstances of the offense in this case are distinguishable from the circumstances of the offense in *J.N.*, *supra*, 23 Cal.App.5th 706. Here, C.S.'s "actual behavior" (§ 707(a)(2)(E)(ii)) included initiating a gang confrontation and stomping on the victim's head, which ultimately killed the victim. This is completely different from the behavior of the juvenile in *J.N.*, who stood frozen during a shooting, which occurred during an unexpected struggle over a gun between two other people. (*J.N.*, *supra*, at pp. 711-712.) Moreover, C.S.'s "mental state" demonstrated an intent to kill; C.S. had a high "degree of involvement in the crime;" and "the level of harm actually caused" by C.S. was the victim's death. (§ 707(a)(2)(E)(ii).) Although the juvenile court did comment that "[t]here is no crime more serious than murder," its findings demonstrate that it focused on more than that factor. For instance, the juvenile court commented that "the unprovoked murder of an unarmed innocent child is the most serious offense of all," and the juvenile court described C.S.'s specific role in the attack.

Substantial evidence supports the juvenile court's finding that the gravity and circumstances of the offense weighed in favor of a transfer of the case to adult/criminal court.

### 6. Decision

C.S. contends that the juvenile court did not properly balance the five section 707(a)(2) criteria but rather rested its decision to transfer him "almost entirely on the seriousness of the charges." C.S. contends that the juvenile court "established a de facto homicide exception" and thus "misapplied the law."

27

It is settled law in other statutory schemes involving the consideration and weighing of numerous factors that the trier of fact may accord appropriate weight to each factor; the law generally does not require that the same weight be accorded to each factor. (See, e.g., *People v. Willover* (2016) 248 Cal.App.4th 302, 323 [resentencing of a juvenile pursuant to Penal Code section 1170, subdivision (d) gives the trial court "discretion to accord different weight to each factor"].) Nothing in section 707 indicates that the juvenile court was required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria.

In this case, however, the juvenile court considered each of the five section 707(a)(2) criteria but made few clear and explicit findings as to which criteria weighed in favor of transfer, which criteria weighed against transfer, and which criteria were neutral. We have been able to infer from the transfer decision that the juvenile court found the gravity of the offense weighed in favor of transfer to adult/criminal court (§ 707(a)(2)(E)(i)). Also weighing in favor of transfer was the juvenile court's finding that there was insufficient time for C.S. to be rehabilitated prior to the expiration of its jurisdiction (§ 707(a)(2)(B)(i)), but the law has since changed to allow C.S. to be held in DJF until he reaches the age of 25 (§ 1769, subds. (b), (d)(2)). We have also inferred from the juvenile court's transfer decision that it found C.S.'s prior delinquent history weighed against transfer to adult/criminal court (§ 707(a)(2)(C)(i)), but we have been unable to discern how the court viewed C.S.'s criminal sophistication (§ 707(a)(2)(A)(i)) and previous attempts at rehabilitation (§ 707(a)(2)(D)(i)).

The juvenile court also did not "articulate its evaluative process" in determining how the different statutory criteria affected its transfer decision. (*Pipinos*, *supra*, 33 Cal.3d at p. 198.) Instead, the court concluded its decision by stating: "After considering all of the judicial transfer factors and evidence presented and considering it in a totality of the circumstances review, this court finds that the People have met its burden of proof by

28

a preponderance of the evidence and grants the People's request to transfer [C.S.'s] case to a court of general criminal jurisdiction." This statement does not allow us to evaluate C.S.'s claim that the juvenile court improperly weighed one criterion over the other criteria.

For these reasons, we conclude that the juvenile court's transfer decision does not permit meaningful appellate review because the juvenile court did not clearly and explicitly "articulate its evaluative process" by detailing "how it weighed the evidence" and by "identify[ing] the specific facts which persuaded the court" to reach its decision to transfer C.S. to adult/criminal court. (*Pipinos*, *supra*, 33 Cal.3d at p. 198.)

## C. *Prejudice*

Although we have determined that the juvenile court's transfer decision does not permit meaningful appellate review, the failure to provide an adequate statement of reasons for a transfer decision will not always require reversal. In *Pipinos,* the California Supreme Court reversed because it was "unable to determine with certainty whether or not the court abused its discretion" based on the record. (*Pipinos*, *supra*, 33 Cal.3d at p. 205; see also *Juan T. v. Superior Court* (1975) 49 Cal.App.3d 207, 212 [same].) However, the court has also found a similar error harmless beyond a reasonable doubt where there was "overwhelming evidence" supporting the juvenile court's decision. (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 722-723 (*Chi Ko Wong*), overruled on other grounds by *People v. Green* (1980) 27 Cal.3d 1, 33-34.)

In *Chi Ko Wong*, the juvenile defendant participated in an armed robbery, wielding a pistol and ordering a cashier to step aside so that his accomplice could remove money from the cash register. (*Chi Ko Wong*, *supra*, 18 Cal.3d at p. 707.) "A gunshot was heard" as the defendant fled from the establishment while pursued by one of its employees. (*Ibid.*) The employee later died from a gunshot wound. (*Ibid.*) The probation report prepared for the fitness hearing revealed that the defendant "had been associated with a major San Francisco Chinese youth gang, that he had been recruited by

29

the gang to act as a 'hit-man,' that he had been charged in San Francisco Juvenile Court proceedings with possession of stolen property and an illegal knife, and that he was suspected of involvement in two Chinese gang homicides." (*Id.* at p. 708.) In addition, the report stated that "while defendant had minimal police contact, authorities considered him to be highly sophisticated; that defendant had not been in school for some time and that he appeared to give little more than lip service to the prospect of returning to school or seeking job training; that defendant's father was completely unable to set standards or controls for him; that defendant had virtually emancipated himself from the home of his parents; that, according to a Los Angeles Police Department source, defendant was suspected of involvement in another shooting in Los Angeles; and that, according to the same source, four handguns and three shotguns were found in defendant's residence at the time of his arrest." (*Ibid.*) The California Supreme Court determined based on this "overwhelming evidence" that the juvenile court's failure to provide a statement of reasons for its decision to deny juvenile court retention was harmless beyond a reasonable doubt. (*Id*. at pp. 722-723.)

In contrast, here, we cannot say that the evidence supporting the juvenile court's transfer decision was "overwhelming." (*Chi Ko Wong*, *supra*, 18 Cal.3d at p. 722.) Most significant to our decision is the criterion regarding C.S.'s potential for rehabilitation prior to the expiration of the juvenile court's jurisdiction. (§ 707(a)(2)(B)(i).) The law now provides that a minor like C.S. may be retained in DJF until age 25. (§ 1769, subds. (b), (d)(2).) Although C.S.'s failure to take responsibility for his role in the offense and failure to admit gang membership impacted his potential for rehabilitation, there was evidence that C.S. wanted to disassociate from gangs. The probation officer's transfer report specified that DJF would offer intensive gang programming. Moreover, there was evidence that C.S. had shown progress while incarcerated; that C.S. could be rehabilitated within two years; and that DJF had programs to address C.S.'s needs. (See § 707(a)(2)(B)(ii).)

Of the remaining four transfer criteria, only the circumstances and gravity of the offense (§ 707(a)(2)(E)(i)) weighed clearly in favor of transfer. The murder of Heriberto was heinous, and C.S. was highly involved in the crime, demonstrated an intent to kill, and caused Heriberto's death. (See § 707(a)(2)(E)(ii).) On the other hand, weighing against transfer was C.S.'s delinquent history. (§ 707(a)(2)(C)(i)-(ii).) The other two transfer criteria were decidedly more neutral, with evidence that supported a finding in favor of transfer and evidence that supported a finding against it. For example, C.S. exhibited criminal sophistication when he acted as one of the aggressors in the incident and after the crime when he refused to engage in text messaging about the offense. (See § 707(a)(2)(A)(i)-(ii).) However, C.S.'s childhood trauma and the evidence regarding his undeveloped brain mitigated against a finding that C.S. was criminally sophisticated at the time of the murder. (*Ibid.*) Similarly, with respect to the success of previous attempts to rehabilitate C.S., while there was evidence that established C.S. did not take advantage of some of the programming he was offered, there was also evidence that he did participate in other programming and that he did not receive all of the services adequate to address his needs. (See § 707(a)(2)(D)(i)-(ii).)

We recognize from the transfer order that the juvenile court carefully considered each of the transfer criteria. However, on this record, the juvenile court's failure to clearly and explicitly "articulate its evaluative process," by detailing "how it weighed the evidence" and by "identify[ing] the specific facts which persuaded the court" to reach its decision (*Pipinos*, *supra*, 33 Cal.3d at p. 198), was not harmless beyond a reasonable doubt (cf. *Chi Ko Wong*, *supra*, 18 Cal.3d at pp. 722-723). We therefore determine that it is necessary to remand this matter to the juvenile court for further findings that are consistent with the requirements set forth in this opinion. The juvenile court should also reconsider the matter in light of the current version of section 1769 and make additional findings as to the section 707(a)(2) criteria in order to permit meaningful appellate

31

review. We express no opinion as to the result the juvenile court should reach on remand.

### D. *Senate Bill No. 1391*

On September 30, 2018, the Governor signed Senate Bill No. 1391 (2017-2018 Reg. Sess.). That legislation, which takes effect on January 1, 2019, will eliminate a prosecuting attorney's authority to bring a transfer motion in a case in which a minor was 14 or 15 years of age at the time of the offense.[14] (Stats. 2018, ch. 1012, § 1, enacting Sen. Bill No. 1391 (2017-2018 Reg. Sess.); see Cal. Const., art. IV, § 8; Gov. Code, § 9600, subd. (a); *People v. Camba* (1996) 50 Cal.App.4th 857, 865.)

The parties submitted supplemental briefs on the effect of Senate Bill No. 1391 on this case. The parties both agree that Senate Bill No. 1391 will be retroactive (meaning it will apply to cases that are not yet final) because it will mitigate punishment. (See *In re Estrada* (1965) 63 Cal.2d 740, 748 [statutory amendment operates retroactively if it "mitigates punishment"]; *Lara*, *supra*, 4 Cal.5th at p. 303 ["being treated as a juvenile in juvenile court" is a lesser punishment than prosecution in adult/criminal court].)

The parties also agree, however, that we cannot provide C.S. with relief based on legislation which has no present legal effect. (See *People v. Righthouse* (1937) 10 Cal.2d 86, 88 (*Righthouse*) ["It has been uniformly held in this state that a statute has no force whatever until it goes into effect pursuant to the law relating to legislative enactments. It speaks from the date it takes effect and not before. Until that time it is not a law and has no force for any purpose."].) Thus, we decline C.S.'s request that we grant his petition on the basis of Senate Bill No. 1391.

Subsequent to the parties' supplemental briefing on the effect of Senate Bill No. 1391 on this case, the district attorney filed an amicus brief arguing that Senate Bill

---

[14] Senate Bill No. 1391 contains an exception for cases in which the minor was not apprehended prior to the end of juvenile court jurisdiction.

No. 1391 was an unconstitutional amendment of Proposition 57. The district attorney points out that Proposition 57 specified that its judicial transfer provisions could be amended by the Legislature, " 'so long as such amendments are consistent with and further the intent of this act.' " (See Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 5, p. 145.) The district attorney asserts that Senate Bill No. 1391 is *not* consistent with Proposition 57 because it eliminates the judicial discretion to transfer 14- and 15-year-olds to adult/criminal court.

We asked the parties for further supplemental briefing on whether the district attorney was correct in asserting that Senate Bill No. 1391 is an unconstitutional amendment of Proposition 57, and on whether that issue was ripe.

C.S. responded that the constitutionality question is ripe but that Senate Bill No. 1391 is not an unconstitutional amendment of Proposition 57. C.S. pointed out that the Legislature originally authorized the prosecution of 14- and l5-year-olds in adult/criminal court when it passed Assembly Bill No. 560 in 1994. He argued that since Proposition 57 did not create the authority to prosecute 14- and 15-year-olds in adult/criminal court, but merely changed the procedures for doing so, Senate Bill No. 1391 is not an amendment to Proposition 57. C.S. alternatively argues that if Senate Bill No. 1391 amended Proposition 57, the new legislation does not conflict with Proposition 57 but rather furthers its purpose of emphasizing rehabilitation for juveniles.

The Attorney General responded that the issue of Senate Bill No. 1391's constitutionality is not "ripe for determination in this case" and that this case "is not the proper vehicle for such an inquiry." The Attorney General asserts that a challenge to Senate Bill No. 1391 should be filed in superior court so that "other interested parties, including but not limited to the proponents of Proposition 57, may be heard." Further, the Attorney General points out, it is generally accepted that an amicus curiae may not "expand the scope of issues on review." (See *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1275 [an amicus curiae may not "[i]nterject[] new

33

issues" in an appeal].)  The Attorney General also submits that Senate Bill No. 1391 is constitutional because it furthers the purposes of Proposition 57.

We decline to reach the merits of the district attorney's argument about the constitutionality of Senate Bill No. 1391.  As previously noted, Senate Bill No. 1391 has yet to go into effect, and it has "no force" as to C.S. at this time.  (*Righthouse*, *supra*, 10 Cal.2d at p. 88.)  Further, since we are ordering the juvenile court to reconsider its section 707(a)(2) findings in light of the amendment to section 1769, which could result in a denial of the transfer motion, it would be premature to consider any issue with respect to Senate Bill 1391.

## IV.    DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to (1) vacate its February 16, 2018 order transferring the matter to adult/criminal court, (2) reconsider the matter in light of the current version of Welfare and Institutions Code section 1769, and (3) issue further findings on the motion to transfer to ensure that its decision permits meaningful appellate review.  This opinion is made final as to this court seven days from the date of filing.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)  The temporary stay order shall remain in effect until this decision is final.

_____
BAMATTRE-MANOUKIAN, J.



WE CONCUR:




_____
GREENWOOD, P.J.




_____
DANNER, J.




*C.S. v. Superior Court*
**H045665**

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court |
| | Superior Court Nos.: JV38951, 213156 |
| | |
| Trial Judge: | Hon. Julianne Sylva |
| | |
| Attorneys for Petitioner: | David Epps, |
| C.S. | Alternate Defender |
| | Alfonso Lopez, |
| | Deputy Alternate Defender |
| | Brian Matthews, |
| | Deputy Alternate Defender |
| | |
| Attorneys for Real Party in Interest: | Xavier Becerra, |
| The People | Attorney General |
| | Gerald A. Engler, |
| | Chief Assistant Attorney General |
| | Jeffrey M. Laurence, |
| | Senior Assistant Attorney General |
| | Donna M. Provenzano, |
| | Supervising Deputy Attorney General |
| | Victoria Ratnikova, |
| | Deputy Attorney General |
| | |
| Attorneys for Amicus Curiae: | Jeffrey F. Rosen, |
| Santa Clara County District Attorney's | District Attorney |
| Office | Jeff H. Rubin, |
| | Deputy District Attorney |

*C.S. v. Superior Court*
**H045665**