Filed 11/6/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| KEVIN P.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>THE PEOPLE,<br><br>        Real Party in Interest. | A159680<br><br>(Contra Costa County<br>Super. Ct. Nos. J18-00823,<br>02-331373-1) |

Kevin P. was charged in juvenile court with a murder he allegedly committed at age 17, and the prosecution moved to transfer him to criminal court under Welfare and Institutions Code[1] section 707, subdivision (a)(1). During a contested hearing lasting several days, the juvenile court was presented with a wealth of evidence demonstrating both the heinousness of the crime and the absence of anything in Kevin's history that would suggest he was capable of it.  He was raised by a loving family, had no prior criminal history, suffered little past trauma, and had no significant psychological or behavioral issues.  And after his arrest, his behavior was exemplary while he was housed at juvenile hall.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

1

Nevertheless, the juvenile court concluded that Kevin was unfit for the juvenile system and granted the prosecution's motion to transfer him to criminal court. Although the court acknowledged there was "a certain tragedy" in its ruling given Kevin's generally positive history outside the context of the charged crime, it determined that the decision was warranted based on three of the section 707 criteria—the circumstances and the gravity of the offense, the degree of criminal sophistication shown, and the improbability of Kevin's rehabilitation before the expiration of juvenile court jurisdiction.

Kevin filed a petition for an extraordinary writ in this court to overturn the juvenile court's transfer ruling. He claims that the juvenile court abused its discretion because there was insufficient evidence to support its findings and it misapplied the law in determining that he could not be rehabilitated before juvenile jurisdiction expired. We conclude the court's findings regarding section 707's gravity and criminal-sophistication criteria are supported by substantial evidence. But we also conclude that the court improperly evaluated section 707's rehabilitation criterion, which it deemed its "most significant" consideration. In doing so, we hold that a court cannot determine a juvenile's rehabilitative needs based solely on the gravity of the offense, and the standard seven-year parole consideration period that applies to juveniles committed to the Department of Juvenile Justice (DJJ)[2] for murder does not establish a presumptive rehabilitation period. Accordingly,

---

[2] Under juvenile justice realignment legislation that went into effect on September 30, 2020, a process to close DJJ and transfer responsibility for youth wards to county governments will begin on July 1, 2021. (§ 736.5, subd. (a), added by Stats. 2020, ch. 337, § 30.) Under the new law, a ward cannot be committed to DJJ after that date unless a transfer motion was filed in his or her case, in which case a DJJ commitment may be made "pending [DJJ's] final closure." (§ 736.5, subds. (b)–(c).)

2

we grant the writ petition and remand the matter to the juvenile court to reconsider its transfer ruling.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Killing and the Police Investigation

On the morning of July 19, 2018, 38-year-old Kishana Harley was found dead in her Richmond apartment's living room.  She had been stabbed 38 times, mostly in her neck, shoulder, and upper back, as well as in the side of her face and the back of her head.  She also had what appeared to be defensive wounds on both hands.

Harley was facedown with a knife handle resting on her back, and a bloody knife blade was on the floor nearby.  The handle and blade appeared to go together to form "a common steak knife."  A butcher knife with a broken tip and blood on it was in the kitchen sink, and there was blood on the counter next to the sink.  Blood was also found in other places throughout the apartment, including in a bathroom.  In addition, a "napkin or paper towel wrapped in blue tape" in a "long" shape, like a "handle of some sort," was in the hallway.

When a police officer arrived at the apartment, she observed blood smeared around the front door, and a glass sliding door to the apartment's patio was slightly open.  The gas burners on the stove were on, and there was a "black charred substance" around Harley's head.  Additional evidence in the apartment also demonstrated attempts to start a fire, including burned napkins on a couch.  Harley's shirt had bleach stains on it, and there was a trail of blue toilet-bowl cleaner from the living room to the master bedroom.  Several items were on the dining table—including a laptop, a purse, and the end of a marijuana joint—and "the whole table and its contents on top were

3

all doused in an unknown substance." Harley's primary cell phone was missing, and her Mercedes was not in the complex's parking lot.

Surveillance footage from the apartment complex showed Harley enter her apartment at around 8:35 p.m. on July 16, 2018, three nights before her body was found. About five minutes later, a male suspect later determined to be Kevin entered the apartment, after initially turning away from it when two other people appeared. Over an hour later, around 10:00 p.m., Kevin left the apartment, and around 11:35 p.m., Harley's Mercedes was driven out of the complex's parking lot. Kevin re-entered Harley's apartment carrying white bags at around 12:05 a.m., left with the bags a few minutes later, and then returned to the apartment and exited it within a few more minutes.

Harley's cell phone records showed that the last call Harley received was at 8:33 p.m. on July 16, a few minutes before Kevin initially entered her apartment. The same number was used to call her 10 times between July 1 and July 16, with no conversation lasting more than three minutes. The number belonged to Kevin's mother, whose cell phone records listed a San Francisco address that was three blocks from where Harley's car was later located, about two weeks after Harley's death. As it turned out, Kevin's family originally lived in San Francisco before moving to Richmond when Kevin was 12 years old, and he continued to attend high school in San Francisco and spent most of his time there.

Based on the cell phone records and a recording of a 2016 encounter with police at his mother's house that showed Kevin wearing black-rimmed glasses similar to those worn by the suspect in the surveillance footage, a warrant issued to obtain his DNA. Forensic testing tended to suggest that a mixture of Kevin's and Harley's DNA was on both the blade and the handle of the butcher knife found in the kitchen sink, with Kevin as the major

4

contributor of the DNA on the blade and Harley as the major contributor of the DNA on the handle. Kevin's DNA was on the kitchen counter and in the bathroom, but it was not on either the handle or blade of the steak knife located by Harley's body, the latter of which had female DNA on it. The evidence also tended to suggest that the blood in the bathroom was Harley's.

During a subsequent search of Kevin's home, the police discovered a butcher block that contained other knives with handles matching the knife handle found on Harley's body, as well as paper towels and painter's tape matching the materials used to make the tape-wrapped object found in Harley's hallway. The police also found a pair of white Nike sneakers, which appeared similar to "bright white shoes" worn by the suspect in the surveillance footage. Both the sole of one of the shoes and the box in which they were found had bloodstains on them.

During his interrogation by police, Kevin initially denied knowing Harley or ever being inside her apartment, but he eventually admitted that he killed her. He reported that he originally met her at a gas station a few weeks before her death and asked her to buy tobacco for him. There was also evidence that the two smoked marijuana together, and some of Kevin's family members thought they had seen Harley's car around their house earlier in July. According to Kevin, on the night in question, he went to Harley's apartment to smoke marijuana with her.

Although Kevin changed his story in several respects throughout the interrogation, he maintained that he stabbed Harley in self-defense after she attacked him with a knife. He also claimed that at one point she stabbed herself when he swung a door open, hitting her. He eventually admitted that he brought a knife with him that night, although he stated that it was for protection because Harley lived in a dangerous neighborhood. He also stated

that the tape-wrapped paper towel was a type of scabbard to cover the blade so he would not cut himself.

As to his actions after the killing, Kevin admitted that he tried to burn Harley's body because Harley "was starting to stink" and "[s]he was a fake." He also acknowledged turning on the stove burners and bringing bags into the apartment, but he claimed he could not remember his reason for either action.

### B. Kevin's Background and Performance in Custody

Kevin is the son of Central American immigrants and grew up in San Francisco's Mission District until moving to Richmond. He has two older half-brothers and a younger sister. Family members described Kevin as affectionate, loving, calm, and respectful. He was especially good with his brother's and his cousin's very young children, "treat[ing] them with care and tenderness."

Kevin and his family members uniformly described his home as "a happy place" without any physical or sexual abuse, domestic violence, or substance abuse. Aside from his parents' separation when he was in elementary school, Kevin did not describe any significant traumatic events from childhood, and his father was still involved in his life. Kevin's family was supportive after his arrest, and his parents regularly visited him in juvenile hall.

For about a year before the offense, Kevin had a paid position working four hours a day at an afterschool program for middle school students run by the Boys & Girls Club of San Francisco. His job responsibilities included facilitating activities and helping with homework, and he connected well with the children and was concerned about them. Indeed, he would routinely stay late at the program even though he was not compensated for those hours.

His co-workers were "very impressed" with his work ethic, responsibility, and respectfulness to other staff, and he won "Youth of the Month" during his employment.

Kevin had no criminal history or arrests before this case. He engaged in some misbehavior, including setting off firecrackers at school and forcing open a bedroom door to retrieve his cell phone after his mother confiscated it, but he had no record of mental illness or any "aggressive or predatory behavior" toward others. Both the forensic social worker and forensic psychologist who evaluated Kevin for the transfer hearing found it significant that he had no gang involvement, despite growing up as a Latino in the Mission District.[3] Kevin admitted to smoking marijuana regularly, but there were no indications of any other type of substance abuse.

Kevin's school records suggested both that he was "highly intelligent" and that he might have "a processing problem" for which a recommended special-education evaluation never took place. Before his arrest, his high school grades were generally poor, primarily due to truancy. After Kevin entered juvenile hall, however, his grades showed "[v]ast improvement in most areas." Indeed, he won several certificates for his scholastic performance, which was described as "pretty exemplary." He eventually graduated from high school and then continued to take classes.

Kevin also received awards for good citizenship while in juvenile hall. He was engaged in therapy and group activities, and he had positive interactions with juvenile hall staff. Although he fought with two other boys

---

[3] Evidence in the record indicates that one of Kevin's brothers was involved in a gang and had several arrests, although these occurred after the brother moved out of the family home.

early in his stay, he ultimately befriended both, and overall he was doing extremely well in custody.

The forensic psychologist's evaluation showed Kevin had average intellectual ability with a possible learning disability related to mathematics, good executive functioning, and no neurocognitive impairments. He did not have conduct disorder, the youth corollary of antisocial personality disorder. It was possible that Kevin had a delusional disorder, which "is a condition where one develops beliefs that have no basis in reality," but the forensic psychologist could not definitively diagnose it because he was directed not to question Kevin about the offense. The psychologist opined, and Kevin's family members and acquaintances agreed, that the "offense conduct, as charged, is completely out of character."

C. *Procedural History*

In September 2018, the Contra Costa County District Attorney filed a petition under section 602 alleging that Kevin murdered Harley. The petition also alleged that Kevin used a deadly and dangerous weapon, a knife, during the murder, as well as the special circumstance that the murder was committed during a burglary or attempted burglary.[4] The prosecution contemporaneously moved to transfer the matter to criminal court under section 707, subdivision (a)(1), and Kevin requested a hearing on whether the prosecution could make a prima facie showing that he committed the alleged offense.

---

[4] The allegations were made under Penal Code sections 187, subdivision (a) (murder), 12022, subdivision (b)(1) (weapon use), and 190.2, subdivision (a)(17) (burglary special circumstance).

A combined prima facie/transfer hearing was held over several sessions during the summer and fall of 2019.[5] Although the prosecution presented testimony from several witnesses about the underlying crime, it presented no testimony about other transfer-related issues from any witness except for the probation officer who prepared a transfer report recommending Kevin be transferred to criminal court. Kevin presented testimony from four witnesses: the forensic social worker and forensic psychologist who evaluated him, his supervisor at the Boys & Girls Club afterschool program, and a DJJ parole agent. Except for the probation officer's testimony and report, the prosecution did not present any evidence to rebut Kevin's showing of his likelihood of being rehabilitated, and the prosecution did not dispute his generally positive history. We discuss the evidence both sides presented in more detail below, in connection with the relevant section 707 criteria.

The juvenile court found that the prosecution established a prima facie case to support the murder charge and that Kevin was not suitable for treatment under the juvenile court system. The court concluded that while two criteria under section 707 supported Kevin's retention in juvenile court—his lack of a delinquent history and the consequent lack of previous attempts to rehabilitate him under the juvenile system—the remaining three criteria supported a finding of unfitness. First, the court found that Kevin exhibited some degree of criminal sophistication, because in addition to trying to cover up the crime, he was not influenced by anyone else to kill Harley and he appreciated the wrongfulness of his behavior. Second, the court found that the crime presented "about as grave of circumstances that could exist," since

_____

[5] The parties stipulated that the evidence presented for purposes of the prima facie hearing could also be considered for purposes of the transfer hearing.

9

it was a "gri[s]ly, gri[s]ly violent murder" that appeared to be premeditated and Kevin's attempts to set a fire endangered the lives of others at the apartment complex. Finally, as to the criterion "most significant" to its decision, the court found that even though Kevin had "done well in [a] structured setting" in juvenile hall, it was unclear that he could be rehabilitated in DJJ before he turned 25.

Accordingly, in November 2019, the juvenile court ordered the matter transferred to criminal court. Two months later, a criminal complaint was filed charging Kevin with same count and allegations brought in the juvenile petition, with the addition of a special circumstance of lying in wait.[6]

In February 2020, Kevin filed a petition for a writ of mandate in this court to compel the juvenile court to vacate its order and enter an order denying the transfer motion. The following month, we summarily denied the petition, and Kevin petitioned for review in the California Supreme Court. On June 10, 2020, the Supreme Court granted review and transferred the matter to this court with directions to vacate our decision denying the writ petition and to issue an order to show cause, and on June 22 we did as directed. The district attorney filed a return, Kevin filed a reply, and the Pacific Juvenile Defender Center and Independent Juvenile Defender Program, Los Angeles County Bar Association, filed an amicus curiae brief on Kevin's behalf. With this additional briefing in mind, we turn to discuss the petition's merits.

---

[6] The lying-in-wait special circumstance was alleged under Penal Code section 190.2, subdivision (a)(15). In addition, the burglary special circumstance alleged more specifically that Kevin committed murder while "engaged in immediate flight" after committing or attempting to commit burglary.

## DISCUSSION

### A. *General Legal Standards*

"Historically, California required a judicial determination of unfitness for juvenile court before a minor could be prosecuted in adult court," and "[s]ince 1975, the procedural requirements for fitness hearings (also called transfer hearings) have been established by section 707." (*D.W. v. Superior Court* (2019) 43 Cal.App.5th 109, 115 (*D.W.*).) In March 2000, the electorate passed Proposition 21, under which "the People were authorized in specified circumstances to file a criminal action against a juvenile directly in adult court." (*D.W.*, at p. 116.) Sixteen years later, however, the electorate passed Proposition 57, which had a stated purpose of " '[s]topping the revolving door of crime by emphasizing rehabilitation, especially for juveniles.' " (*People v. Superior Court (Alexander C.)* (2019) 34 Cal.App.5th 994, 1000, quoting Voter Information Guide, Gen. Elec. (Nov. 8, 2016), text of Prop. 57, § 2, p. 141.) "To increase the number of minors in the juvenile system, Proposition 57 eliminated Proposition 21's system of direct filing in criminal court" and "amended section 707 to require a transfer hearing before a juvenile can be prosecuted in adult court to determine whether the minor can be rehabilitated in juvenile court," effectively "return[ing] California to the historical rule." (*Alexander C.*, at p. 1000; *D.W.*, at p. 116; *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 711 (*J.N.*).)

Specifically, the law now provides that "[w]hen a minor has been charged in the juvenile court with any felony allegedly committed when he or she was 16 years of age or older"—as Kevin was—"the prosecutor 'may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction.' " (*J.N.*, *supra*, 23 Cal.App.5th at p. 711, quoting § 707,

11

subd. (a)(1); Cal. Rules of Court, rule 5.766(a)(2).)[7]  Upon receiving a transfer motion, the juvenile court is required to "order the probation officer to submit a report on the behavioral patterns and social history of the minor."  (§ 707, subd. (a)(1).)  In addition to the transfer report, the court may consider "any other relevant evidence that the [prosecutor] or the minor may wish to submit."  (§ 707, subd. (a)(3).)  "The prosecution bears the burden of establishing by a preponderance of the evidence [that] the minor is not a suitable candidate for treatment under the juvenile court system."  (*J.N.*, at p. 715; rule 5.770(a).)  "Whether the youth committed the act alleged in the petition is not the issue in such a determination; the sole question is whether he [or she] would be amenable to treatment in the event that he [or she] is ultimately adjudged a ward of the court."[8]  (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 716 (*Chi Ko Wong*).)

In ruling on a transfer motion, the juvenile court must consider five criteria under section 707:  (1) "[t]he degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) the "[s]uccess of previous attempts by the juvenile

---

[7] All further rule references are to the California Rules of Court.

[8] In response to a transfer motion, the minor may " 'challenge[] the sufficiency of the evidence establishing that he [or she] committed the alleged offense[],' " in which case "the People must 'make a prima facie showing that the minor committed the crime[].' "  (*D.W.*, *supra*, 43 Cal.App.5th at p. 116; *Edsel P. v. Superior Court* (1985) 165 Cal.App.3d 763, 784; rule 5.766(c).)  The juvenile court must find the prosecution has made the required prima facie showing, which is "generally equivalent to 'reasonable and probable cause,' " before it rules on whether the minor is fit for juvenile treatment.  (*D.W.*, at pp. 116, 118–119.)  In practice, a so-called "*Edsel P.* hearing" may be held jointly with the transfer hearing (see *D.W.*, at p. 116), as occurred in this case.

court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)–(E); see rule 5.770(b)(2).) "The weight to be given [to] each of these factors is within the court's discretion" (*D.W.*, *supra*, 43 Cal.App.5th at p. 116), as "[n]othing in section 707 indicates that the . . . court [is] required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria."[9] (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1035 (*C.S.*).)

Appellate review of a juvenile court's ruling on a motion to transfer a minor to criminal court is by a petition for an extraordinary writ. (Rule 5.770(g).) We review such rulings for an abuse of discretion. (*J.N.*, *supra*, 23 Cal.App.5th at p. 714.) The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. (*Ibid.*) A decision based on insufficient evidence or the court's " 'erroneous understanding of applicable law' " is subject to reversal. (*Id.* at pp. 710, 714–715.)

B.   *There Was Substantial Evidence that the Crime's Gravity and Circumstances Supported Kevin's Transfer to Criminal Court.*

Kevin argues that insufficient evidence supported the juvenile court's findings involving "[t]he circumstances and gravity of the offense alleged in

---

[9] Before Proposition 57, section 707 provided that the decision to transfer a minor to criminal court could "be based on any one or a combination of the [five] factors." (Former § 707, subd. (a)(1); see *Chi Ko Wong*, *supra*, 18 Cal.3d at p. 717, fn. 15 ["any one" of five factors "is sufficient to support a finding of unfitness"].) The current statute directs that a juvenile court "shall consider" all five criteria but does not specify how many must support transfer. (§ 707, subd. (a)(3).) Our decision here does not require us to decide whether it remains true that a court can transfer a minor even if only one criterion supports doing so.

13

the petition to have been committed by the minor." (§ 707, subd. (a)(3)(E)(i).) We disagree.

### 1. Additional facts

The probation officer believed that the gravity criterion weighed in favor of Kevin's transfer to criminal court. She focused on the facts that Kevin was the only perpetrator of the crime, stabbed Harley 38 times, and took measures to cover up his involvement that could have seriously endangered other residents of Harley's apartment complex. Although acknowledging that Kevin claimed he acted in self-defense, the probation officer observed that "the thought and execution of dousing the entire apartment with a chemical and strategically placing tissue and pillows around the victim's body to set her on fire goes beyond self-defense."

The forensic psychologist, Dr. John Shields, Ph.D., conceptualized this criterion as addressing not just the seriousness of the crime—which he agreed was "a very violent, egregious, horrific crime" committed by Kevin alone—but whether the behavior was "so grave as to impede or preclude" Kevin's rehabilitation. Noting that Kevin had made significant progress toward rehabilitation while in juvenile hall, Dr. Shields determined that the crime was not "so indicative of [his] character, so grave in nature to suggest that rehabilitation isn't possible, or [that] it would be so hampered that it would take an indefinite period of time."

In explaining his inability to conclude that the criterion favored transfer despite the admitted seriousness of Kevin's criminal behavior, Dr. Shields highlighted the lack of context for understanding Kevin's actions. In particular, he indicated that there were "a number of important, yet unanswered, . . . questions about precisely what occurred," including the

14

nature of Kevin and Harley's relationship and the extent to which Kevin acted because he was in fear of Harley.

Indeed, other evidence presented at the hearing suggested the killing was not necessarily a straightforward premeditated murder. In addition to the physical evidence suggesting Harley also had a knife during the encounter, evidence of her aggressive character was presented. Harley's boyfriend described her as having "mood swings kind of going from . . . zero to [a] hundred, and getting mad over small things or nothing," and another friend indicated she had "significant anger issues" involving a custody dispute with the father of her two young children. On at least one occasion, both Harley and the father of those children were arrested as a result of a domestic violence incident in New York. Finally, and most significantly, less than two years before her death Harley assaulted her older daughter outside the daughter's middle school, punching the child with a belt wrapped around her knuckles. After the daughter reported that Harley often beat her without provocation, she was removed from Harley's custody, and she remained in foster care at the time of Harley's death.

The juvenile court concluded that the gravity criterion favored transfer, specifically rejecting Dr. Shields's position that "the very nature of the circumstances and gravity do not impede [Kevin's] rehabilitation." Observing that "[t]here is no question that this was a gri[s]ly, gri[s]ly violent murder" during which Kevin acted alone, the court found it "pretty clear . . . that this is about as grave of circumstances that could exist." The court also found it "worthy of mentioning under this [criterion]" that Kevin tried to set a fire after the killing, "because his further actions created a further risk to all of the residents of [Harley's] apartment complex."

15

As to Kevin's mind state, the juvenile court determined that Kevin acted with "some type of premeditation or some type of intent to inflict some type of serious harm to [Harley]," based on the fact he "brought a knife from his own home to [her] home," initially backed away from entering her apartment when other people were nearby, and made other efforts to avoid detection after committing the crime. The court specifically rejected Kevin's claim of self-defense, stating, "His assertion that this [was] self-defense is not credible. The amount of force that was inflicted upon [Harley] is well beyond any type of reasonable force that would be necessary to protect yourself and get yourself to a situation of some type of safety. At one point there was a reference to a door opening and therefore she stabbed herself. These types of comments are honestly, they are ludicrous. That's not how this occurred."

2. Discussion

The gravity criterion focuses on the offense " '*alleged in the petition*' " (*D.W.*, *supra*, 43 Cal.App.5th at p. 119), and like the other statutory criteria, it is "based on the premise that the minor did, in fact, commit the offense." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 682 (*Jones*).) But the allegation that a minor committed a serious offense, including murder, does not "automatically require a finding of unfitness." (*Ibid.*; *J.N.*, *supra*, 23 Cal.App.5th at p. 724.) Rather, in evaluating this criterion, a juvenile court may rely on evidence that, "while not justifying or excusing the crime, tends to lessen its magnitude" (*Jones*, at p. 685), "including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).)

16

Kevin acknowledges that "the nature of the offense alleged is grave and serious," but he argues that there was nevertheless insufficient evidence of his "actual behavior" and "mental state" during the crime. He points out that "there were significant unresolved questions as to what occurred, and no third-party percipient witnesses to the crime," leaving Dr. Shields unable to "opine that this criterion weighed in favor of transfer" without "additional information." But while a minor's "actual behavior" and "mental state" during the crime are among the factors deemed relevant under section 707, subdivision (a)(3)(E)(ii), there need not be substantial evidence that *all* of the factors the statute lists weigh in favor of transfer to uphold a juvenile court's evaluation of the gravity criterion. To the contrary, a court's consideration of the listed factors or "any [other] relevant factor" is permissive, not mandatory. We recognize that some mitigating evidence about Kevin's "actual behavior" and "mental state" was presented, including his own claim of self-defense.[10] But this does not undermine other substantial evidence of the crime's seriousness, including the evidence that Kevin acted alone and under no outside influence, stabbed Harley dozens of times, and engaged in additional behavior dangerous to human life to cover up the crime.

Kevin also claims that the gravity criterion must be evaluated in light of the ultimate issue at a transfer hearing, whether a minor " 'is amenable to the care, treatment[,] and training program[] available through juvenile court facilities.' " (Quoting *Chi Ko Wong, supra,* 18 Cal.3d at p. 717.) He seems to

---

[10] The juvenile court found this claim was not credible, but we interpret the finding as rejecting only a claim of perfect self-defense, given the court's statement that Kevin did not use "reasonable force." Even if Kevin did not act in perfect or even imperfect self-defense, it is still possible that he acted in response to provocation from Harley, which would reduce the crime from first degree to second degree murder. (See *People v. Rivera* (2019) 7 Cal.5th 306, 328.)

suggest that the juvenile court was precluded from finding this criterion weighed in favor of transfer in light of Dr. Shields's opinion that " 'as heinous and egregious as this event was, . . . it [was] not so grave as to hamper or preclude [Kevin] from being rehabilitated.' "  Although we agree that the circumstances and gravity of the crime are relevant because they bear on a minor's prospects of rehabilitation, Kevin does not offer any authority for the proposition that expert testimony—or any other evidence beyond that bearing on what happened during the crime—is required to evaluate this criterion. In short, there was substantial evidence to support the court's conclusion, even though there may have also been substantial evidence to support a different conclusion.

C.    *Substantial Evidence Supported the Determination that Kevin's Criminal Sophistication Weighed in Favor of Transfer.*

Kevin also argues that insufficient evidence supported the juvenile court's findings as to the statutory criterion involving "[t]he degree of criminal sophistication exhibited by the minor."  (§ 707, subd. (a)(3)(A)(i).)  In addition, he claims that the court's discussion of how it evaluated this criterion was too limited to provide "an adequate record for review."  We are not persuaded on either count.

1.    Additional facts

The probation officer believed that Kevin's degree of criminal sophistication also weighed in favor of his transfer to criminal court. Concentrating on the crime itself, she observed that despite his claim of self-defense, he brought a weapon with him to Harley's apartment and "made efforts to avoid being detected" when he first arrived, suggesting both that the killing was premeditated and that he knew "he was about to do something wrong."  She also identified other indications that Kevin "was aware of the wrongfulness of his actions," including his "heinous actions to

18

burn and destroy the crime scene, failure to seek assistance and report the incident, and [decision] to flee the scene, only to return and flee again." Finally, she noted that Kevin did not have any "documented history of mental health issues, childhood trauma, or diminished intellectual capacity" suggesting he was unable to distinguish between right and wrong.

Dr. Shields, in contrast, concluded that Kevin's attempts to conceal the crime demonstrated "the absence of sophistication." Among other "hopelessly unsuccessful" actions, Kevin left the steak knife at the scene, kept the shoes he wore that night even though they had blood on them, and failed to destroy other physical evidence through either chemical agents or fire. And despite the six-week gap between Harley's killing and his interrogation, Kevin did not come up with a plausible explanation for why, if he did not know Harley, the phone records showed his number called hers numerous times. Dr. Shields also opined that "outside of the facts of this crime," there was "nothing in the assessment data or in [Kevin's] history that suggests . . . that he is an individual who is developing a criminally sophisticated character." Indeed, Kevin's "criminal character" seemed much less developed than that of most other 18-year-old boys in juvenile hall, and he was not "an adolescent who maintains that harming people, assaulting people[,] or committing any form of crime . . . is a routine or acceptable form of conduct."

More generally, Dr. Shields testified about recent research on the brain chemistry of adolescents, which is "significantly different" from that of adults. Adolescents' brains continue to develop until they reach their early 20's, and there is generally a large gap between their "psychosocial maturity" and their intellect, the latter of which develops more quickly. As a result, the behavior an adolescent exhibits is less indicative of a long-term character trait than it would be if an adult exhibited it, since "there is more development that's

19

going to take place that's going to improve reasoning ability, it's going to improve ability to foresee future consequence, it's going to be able to be more resistant to risk taking, outside influence, all of these kinds of things that we know adolescents are vulnerable to." Thus, "there is much more potential in adolescents for change and development pro-socially than we thought previously."

The juvenile court concluded that the criminal-sophistication criterion weighed in favor of transfer to criminal court. After observing that Kevin was about 17 and a half years old at the time of the offense, the court reviewed evidence that he was a normally functioning teenager. The court noted that he seemed to be "of normal intelligence," based on educational testing and his obtaining of a diploma while in juvenile hall, and "his cognitive functioning seem[ed] to be perfectly fine and [was] not impaired." The court also noted that although it accepted the testimony about adolescent brain development, Dr. Shields had "opined that Kevin has good executive functioning." The court observed that Kevin's "family background . . . is unusually devoid of any type of abuse; either emotional, physical, any type of what I would refer to as difficulty in his upbringing." And while "his older brother was reported to be a gang member," it did not "appear that his brother influenced him in any way. It sounds like [Kevin] had very positive adults surrounding him." Finally, the court found that "external influences" did not appear to play a role in the offense. To the contrary, Kevin had shown "the ability . . . to make good decisions in the face of tremendous pressure" by resisting gang affiliation.

The juvenile court also addressed Dr. Shields's opinion that Kevin's unsuccessful attempts to cover up the crime demonstrated a lack of criminal sophistication. After expressly finding Dr. Shields's testimony credible, the

20

court stated that it nevertheless "did not necessarily agree with everything that Dr. Shields said." The court acknowledged that Kevin "clearly made some botched efforts to conceal what had occurred," but it also observed that "for several weeks" after the crime "he acted as if honestly nothing had happened" and might have escaped detection altogether "[b]ut for the phone calls that were discovered [in] the phone records." The court found that Kevin's efforts at concealment were also significant "because he knew of the wrongfulness and the consequences of this conduct," concluding that "Kevin has the ability to appreciate the risks and consequences of his criminal behavior."

### 2.    Discussion

The criminal-sophistication criterion "requires a juvenile court . . . to consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime." (*Jones*, *supra*, 18 Cal.4th at pp. 683–684.) In evaluating this criterion, "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).)

Initially, we reject Kevin's cursory assertion that the juvenile court failed to articulate its reasoning sufficiently to provide an adequate record for review. He relies on *C.S.*, in which the Court of Appeal granted the minor's writ petition after "conclud[ing] that the juvenile court's transfer decision

21

[did] not permit meaningful appellate review because the juvenile court did not clearly and explicitly 'articulate its evaluative process' by detailing 'how it weighed the evidence' and by 'identify[ing] the specific facts which persuaded the court' to reach its decision to transfer," including as to the criminal-sophistication criterion. (*C.S.*, *supra*, 29 Cal.App.5th at pp. 1030–1031, 1035, 1039.) Although the juvenile court in *C.S.* "discussed relevant factors—such as [the minor's] early childhood, the expert testimony regarding [his] brain development, [his] prior offenses, and [his] gang involvement"—it did not specify whether those factors or the criminal-sophistication criterion generally weighed in favor of transfer. (*Id.* at pp. 1030–1031.)

Here, in contrast, the juvenile court unambiguously found that the criminal-sophistication criterion "favor[ed] transfer to adult court." Although the court did not explicitly state whether each particular factor it discussed "weighed in favor of transfer, against transfer, or was neutral" (*C.S.*, *supra*, 29 Cal.App.5th at p. 1030), in the context of the court's overall discussion we think its reasoning is sufficiently clear. Specifically, it appears the court found that Kevin's age, maturity, cognitive functioning, and positive upbringing and social history, as well as his attempts to cover up his involvement in the crime, weighed in favor of transfer to criminal court because they demonstrated his "ability to appreciate the risks and consequences of his criminal behavior" and his awareness "of the wrongfulness . . . of [his] conduct." And given its ultimate conclusion about this criterion, the court appears to have found that these factors outweighed other factors tending to suggest an absence of criminal sophistication, including Kevin's lack of "extensive prior criminal behavior" and Dr. Shields's testimony about the adolescent brain.

Whether the factors on which the juvenile court relied *should* weigh in favor of a finding of criminal sophistication is a separate question. Kevin argues that the court "seem[ed] to imply that [his] positive character traits and . . . potential for growth equate to a sophisticated criminal character," which "surely . . . would be an abuse of discretion, as *positive* character traits and protective factors cannot reasonably be used to support transfer." Similarly, his amici curiae contend that "[a]though strong family support, positive and prosocial activities, normal intelligence[,] and lack of gang involvement are all factors tending to support healthy emotional development, maturity[,] and 'sophistication' as the term is used in the non-criminal context, they are not factors that lead to the development of *criminal* sophistication of the type the juvenile court is required to evaluate" under section 707.

We agree that such positive factors do not affirmatively demonstrate criminal sophistication. Positive background factors may support a juvenile court's finding that this criterion weighs in favor of transfer to the extent they fail to mitigate other evidence that does affirmatively demonstrate criminal sophistication. Thus, the gang involvement of a minor with poor cognitive functioning might demonstrate a lesser degree of criminal sophistication than the gang involvement of a minor with normal cognitive functioning. But the mere fact that a minor is of normal intelligence, for example, does not tend to prove that he or she is criminally sophisticated. Likewise, Kevin's knowledge that his actions were wrong and his ability "to appreciate risks and consequences of criminal behavior" (§ 707, subd. (a)(3)(A)(ii)), which the juvenile court focused on, do not in and of themselves demonstrate criminal sophistication.

23

The juvenile court, however, did not rely only on Kevin's positive characteristics in concluding that this criterion weighed in favor of transfer. It also relied on his attempts to avoid detection.[11] These attempts included using chemical agents on Harley's body and throughout the scene and attempting to set Harley's body and apartment on fire. We conclude that such behavior constitutes substantial evidence of a certain degree of criminal sophistication. Although there is room for doubt about what precipitated Harley's killing and how impetuous the killing was, it is reasonable to infer from Kevin's activities over a sustained period after Harley's death that he formulated and carried out a strategy to cover his tracks.

Kevin argues that his attempts to avoid detection are not substantial evidence of criminal sophistication because "an effort at concealment does not . . . suggest an individual is a sophisticated criminal" unless "the *manner* in which the effort is made" is criminally sophisticated. But this position cannot be reconciled with *Jones*, even accepting that Kevin's efforts were hardly the work of a criminal mastermind. In *Jones*, our state Supreme Court held that insufficient evidence supported the juvenile court's determination that the minors lacked criminal sophistication, even though they "had no previous

[11] Notably, the juvenile court did *not* rely on evidence of pre-killing planning activity in connection with the criminal-sophistication criterion. (See *Jones*, *supra*, 18 Cal.4th at p. 684 [minors' "planning and execution of [a] robbery" that culminated in store owner's shooting "involved a degree of criminal sophistication precluding a finding of fitness"].) The court mentioned that Kevin brought a knife to Harley's apartment, but it did so while discussing his "efforts to conceal [the crime]," stating, "[H]e did go to [Harley's] home with at least one of the weapons with I believe some wrapping around the handle to obscure any hand[prints] or fingerprints, I assume." Thus, although the People focus on Kevin's supposed plan to murder Harley in arguing that the court properly evaluated this criterion, we do not address whether evidence of planning activity supports the court's ruling.

24

record of participation in any criminal offenses, gang activity, or mischievous conduct," and their plan to rob a store "was uncomplicated and ineptly executed." (*Jones, supra*, 18 Cal.4th at pp. 683–684.)  Thus, the Court effectively concluded not only that ineptitude in one's criminal activities does not preclude a finding of criminal sophistication, but also that such ineptitude does not even constitute substantial evidence of a *lack* of criminal sophistication.

We recognize that *Jones* was decided over 20 years ago, when the juvenile transfer law differed in several respects from its current form. Under then-prevailing law, the *Jones* minors had the burden of overcoming a presumption of unfitness for treatment in the juvenile court system, which required them to prove by a preponderance of the evidence that each of the five section 707 criteria demonstrated their fitness.  (*Jones, supra*, 18 Cal.4th at pp. 677, 680–681.)  In addition, as amici curiae observe, *Jones* was decided before section 707 was amended to list specific factors relevant to each criterion and before the general shift in the law to recognize more fully that " 'the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.' "  (Quoting *Miller v. Alabama* (2012) 567 U.S. 460, 472.)  But while it may be that our state Supreme Court would analyze the criminal-sophistication criterion differently today, we are not free thereby to disregard *Jones*'s discussion of it to the extent that discussion is consistent with the current statutory scheme.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  In light of *Jones*, we conclude that Kevin's attempts to cover up the crime constitute substantial evidence of criminal sophistication even if they were "hopelessly unsuccessful."

25

D.      *The Juvenile Court Improperly Evaluated the Rehabilitation Criterion.*

Finally, Kevin contends that the juvenile court erred in evaluating the rehabilitation criterion. We agree. The court determined that the standard seven-year parole consideration period applicable to juveniles committed to DJJ for murder established a minimum rehabilitation period for Kevin, and it found that he was therefore unlikely to be rehabilitated while it retained jurisdiction. We conclude both that the court erred by relying on the seven-year period as a "baseline" rehabilitation period and that insufficient evidence supports the finding that Kevin was unlikely to be rehabilitated before juvenile court jurisdiction expired.

1.      Additional facts

The probation officer testified that she contacted DJJ to obtain Kevin's parole consideration date, which is based solely on the generic offense charged. She was told that the standard parole consideration date for murder is seven years and that juvenile jurisdiction would exist until Kevin reached age 25. Given that "it takes 60 to 90 days to be delivered to DJJ . . . following a commitment" and that Kevin "would be released 90 to 100 days prior to jurisdiction expiring," the probation officer calculated that he "would have approximately six and a half years to take advantage of rehabilitative services offered at DJJ."

In her report, the probation officer observed that "[b]ased on [Kevin's] positive behavior while being detained in [j]uvenile [h]all, it appears [he] is able to program well in a structured environment." She nevertheless concluded that "[g]iven the extreme circumstance of the allegations and the gravity of [Kevin's] actions, it is not likely a DJJ commitment would allow ample time to rehabilitate and take full advantage of therapeutic services." She also concluded that "a DJJ commitment may not allow adequate time for

26

supervision following [Kevin's] release from DJJ," meaning that "the [j]uvenile [c]ourt would not be able to gauge [his] rehabilitation and ensure the community's safety." At the hearing, the probation officer reiterated that "based on the totality of the circumstances of the offense," there was simply "no way to know if seven years is enough to rehabilitate." Thus, "erring on the side of caution given that [upon] release there would be no supervision, [the probation department] did not believe that a commitment to DJJ would be appropriate."

The probation officer confirmed that her opinion was not based on an assessment of Kevin's particular rehabilitative needs. She agreed that she could "not identify specific therapeutic services that Kevin would be unable to take advantage of if committed to DJJ until age 25" and that she did not "have the training and expertise to be able to opine Kevin needs 'X' program and that program is not available at DJJ." Rather, her opinion "was based solely on the fact that this is a serious offense," and she acknowledged that "other than the circumstances of the current offense there [was] nothing that [she] identified to suggest that Kevin is a serious danger to the public" and "nothing in Kevin's history to suggest that he is not amenable to rehabilitation in [j]uvenile court."

Dr. Shields concluded that Kevin showed "significant rehabilitative potential." In explaining this conclusion, Dr. Shields identified several factors demonstrating Kevin's amenability to rehabilitation. During their meetings, Kevin seemed "boyish" and "eager to please," which Dr. Shields found unusual compared to his experience with other older boys at juvenile hall. Indeed, it became "quickly apparent" to Dr. Shields that Kevin did not exhibit any signs of antisocial behavior he typically saw when evaluating other minors, including unwillingness to interact, disrespectful language, and

27

resistance to cooperating. Psychological testing confirmed this impression, as it did not show any signs that Kevin was developing an antisocial character. To the contrary, Dr. Shields found Kevin to be "exquisitely receptive to the input of authority figures . . . [and] the prospect of services that might be available to him," characterizing him as "not an individual who is going to inhibit the rehabilitative process."

Dr. Shields observed that Kevin's family environment was supportive and positive, without any indications of "ongoing criminality" or the condoning of delinquency. Kevin had excellent relationships with his family members and was trusted with the significant responsibility of caring for young children. Kevin described being taught good values, including hearing from his parents that it was important to learn from one's mistakes. Specifically, Kevin's avoidance of gang involvement indicated his family's positive influence on his morals.

Dr. Shields also found Kevin's positive employment history at the Boys & Girls Club to be significant, especially because it offered the chance for another adult outside the family to observe Kevin's character and responsibility. Dr. Shields testified, "I can't think of another individual I've evaluated in a transfer hearing for whom that could be said, that . . . they have that extent of sustained employment and dedication to what they are doing."

Kevin's performance at juvenile hall demonstrated his amenability to rehabilitation as well. His grades showed marked improvement once he entered a structured setting, which Dr. Shields testified was unusual, since "typically the way that [minors] perform in the community-based setting is going to be indicative of how they perform in the [j]uvenile [h]all setting." In addition, aside from the two fights early in his time there, Kevin exhibited

28

"prosocial" behavior in juvenile hall. Dr. Shields found it particularly significant that Kevin was willing to meet with a therapist, because it showed his "openness to the input . . . of adults in a rehabilitative way. [¶] . . . [¶] Many kids who are much more criminally oriented or psychopathically developing, if you will, are going to stay as far away from those people [as] they can, and if they do interact with those people it's been in my experience [in] a very negative way. But we don't see that from Kevin."

Kevin's remorse over Harley's death also indicated to Dr. Shields that Kevin could be rehabilitated. Kevin stated that he "felt badly for what happened" and recognized the crime's negative impact on Harley's family. Dr. Shields explained that it was "a positive sign" for "an adolescent to be able to express genuine feeling with noticeable and appropriate shifts in their emotional expression or their tone," and Kevin did not "ma[k]e light of [the crime] . . . or distance[] himself from responsibility."

Finally, Dr. Shields performed a juvenile risk assessment that showed Kevin posed a low risk of future violent behavior. Dr. Shields noted that the assessment did not account "to any significant degree" for the nature of the subject's current offense, which research showed was not "a significant predictor of recidivated violence." As Dr. Shields explained, although "common sense would tell us that . . . someone who commits a very violent, serious offense . . . must be a very, very dangerous individual," in fact even "perpetrators of the most severely violent behavior, if they are not antisocially predisposed . . . or do not have psychopathic character, or some other factor that would suggest probability for violence, then the risk for reoffense in those cases is actually quite low."

The juvenile court deemed the rehabilitation criterion "the most significant" factor in its decision to grant the prosecution's transfer motion.

29

Based on DJJ's "seven-year baseline" for the offense, the approximately 45-day "delay getting individuals to DJJ," the need to release individuals 90 to 120 days before juvenile court jurisdiction expires at age 25, and Kevin's age of 18 and a half years at the time of the hearing, the court calculated that "by the time [Kevin] were to get to DJJ, . . . [there] would be . . . well less than seven years," or even "under six years," remaining for Kevin "to be able to engage in the services at DJJ." Even though the court agreed that Kevin had done well in juvenile hall, it found that the rehabilitation criterion "favor[ed] transfer to adult court" because he would spend less than seven years in DJJ. Ultimately, the court concluded that despite Kevin's "very good upbringing" and the lack of "warning signs leading up to this," he had "a side to him that is extremely dangerous and [it did not] think that the community [could] be safe if he is tried in juvenile court."

### 2. Discussion

The rehabilitation criterion addresses "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction," and section 707 identifies "the minor's potential to grow and mature" as a "relevant factor" to the evaluation. (§ 707, subd. (a)(3)(B)(i)–(ii).) A juvenile court can retain jurisdiction over a minor committed to DJJ for the offense of murder until the minor reaches age 25. (§§ 607, subd. (b), 707, subd. (b)(1), 1769, subd. (b); *C.S.*, *supra*, 29 Cal.App.5th at p. 1031.)

Separately, a DJJ regulation in effect for decades establishes "[a] parole consideration date interval of seven years" when a minor is committed to DJJ for various offenses, including murder. (Cal. Code Regs., tit. 9, § 30807 [formerly Cal. Code Regs., tit. 15, § 4951].) Thus, "as a general rule, a minor confined for committing first degree murder is eligible for parole consideration at least every seven years." (*In re R.O.* (2009) 176 Cal.App.4th

30

1493, 1498, fn. 6.)  Although "[a] parole consideration date represents, from its date of establishment, an interval of time in which a ward may reasonably and realistically be expected to achieve readiness for parole[,] . . . [i]t is not a fixed term or sentence, nor is it a fixed parole release date."  (Cal. Code Regs., tit. 9, § 30815, subd. (a).)  To the contrary, "[a] parole consideration date may be adjusted by the Board [of Juvenile Hearings] in response to the individual training and treatment needs of a ward."  (*Id*., § 30815, subd. (g).)  Indeed, as amici curiae point out, the Board is *required* "to discharge the minor 'as soon as in its opinion there is reasonable probability that he or she can be given full liberty without danger to the public.' "  (*R.O.*, at p. 1498, fn. 6, quoting § 1765, subd. (b).)

Kevin claims that the juvenile court erred in treating the "seven-year baseline" for murder as establishing a "minimum rehabilitation period."  He argues that the seven-year period addresses parole eligibility, not rehabilitation, and his eligibility for parole before age 25 does not affect "whether, based on his individual needs, risk and protective factors, attitude, intelligence, and demonstrated amenability to treatment, he can be rehabilitated within the allotted time."  The People respond that the juvenile court "was within [its] rights to infer that this period of time was indicative of how long [Kevin] might need to be at [DJJ]" and that "[t]he seven-year baseline was a useful guide for the [c]ourt in assessing the time needed to rehabilitate a minor who . . . committed murder."

We agree with Kevin that the parole consideration period does not establish a minimum rehabilitation period.  The People do not cite any legal authority for the proposition that a juvenile court may rely on the seven-year period to reach any conclusions about what a particular minor's rehabilitative needs and prospects are.  If anything, presuming that a minor who

31

committed murder will take at least seven years in DJJ to rehabilitate is inconsistent with section 707, since it necessarily disfavors juvenile treatment for those, like Kevin, who are accused of committing murder at age 17. (See *J.N.*, *supra*, 23 Cal.App.5th at p. 724.) Without more, the fact that juvenile court jurisdiction may expire before a minor is considered for parole is immaterial in evaluating section 707's rehabilitation criterion.[12]

Kevin further argues that in focusing on the seven-year period, the juvenile court "failed to adequately address whether [he] could be rehabilitated prior to the expiration of juvenile court jurisdiction—the actual question posed by the [rehabilitation] criterion." According to him, "the prosecution failed to present any evidence as to what efforts would be necessary to rehabilitate [him], what programs exist in the juvenile system geared toward addressing [his] rehabilitative needs, and any reason why [he] could not avail himself of these programs or be rehabilitated in the time allotted." He claims insufficient evidence therefore supports the juvenile court's determination that the rehabilitation criterion weighed in favor of transfer. Again, we agree.

"If the possibility that [DJJ] might have to treat a ward of the juvenile court beyond the age of his [or her] majority is the determinative factor in the court's decision that the minor is unfit [for treatment as a juvenile], there must be substantial evidence in the record that successful treatment might require the extra time." (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709,

---

[12] As a result of this conclusion, we find it unnecessary to address Kevin's contention that the juvenile court also abused its discretion by discounting the possibility of a commitment past age 25 under section 1800, which permits DJJ to petition to retain control of a minor who "would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality that causes the person to have serious difficulty controlling his or her dangerous behavior."

715.) "Expert witnesses may testify on the availability of treatment programs in the juvenile court system and the amenability of the minor to those programs. [Citation.] In those cases where the juvenile court might decide treatment as a juvenile would be in the minor's best interest, the court could still find the minor 'unfit *if* those experts testified that rehabilitation might require treatment beyond the date of his [or her] mandatory discharge.' " (*J.N.*, *supra*, 23 Cal.App.5th at pp. 721–722, quoting *Jimmy H.*, at p. 715.)

In *J.N.*, the Fourth District Court of Appeal held that insufficient evidence supported the juvenile court's determination that a minor accused of murder "was not an appropriate candidate for treatment in the juvenile justice system under this criterion." (*J.N.*, *supra*, 23 Cal.App.5th at pp. 721–722.) Despite recognizing that the minor " 'ha[d] come a long way in custody,' " the juvenile court determined that the fact that only three years remained before its jurisdiction expired weighed in favor of transfer. (*Id.* at p. 721.) At the transfer hearing, however, "the prosecution did not present any expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction. There was no evidence that demonstrated existing programs were unlikely to result in [the minor's] rehabilitation, why they were unlikely to work in this case, or that they would take more than three years to accomplish the task of rehabilitating [him]." (*Id.* at p. 722.) As a result, the finding that the minor was unsuitable for treatment in juvenile court constituted an abuse of discretion. (*Ibid.*)

The prosecution here similarly presented little if any evidence to demonstrate what Kevin's rehabilitative needs were, much less why they

33

could not be met through a DJJ commitment.[13] Dr. Shields testified that Kevin had good prospects of being rehabilitated in the juvenile system, based on evidence of Kevin's positive characteristics, lack of serious psychological issues, performance in juvenile hall, and low risk of reoffense. The prosecution offered no contrary expert testimony. While the probation officer opined that the rehabilitation criterion favored transfer, her opinion was speculative, as she agreed there was "no way to know" if Kevin would be rehabilitated before juvenile court jurisdiction expired. Moreover, she candidly agreed her opinion was based on nothing specific about Kevin except "the circumstances of the current offense." Thus, "[e]ven if we were to accept the probation officer's conclusion in the [transfer] report as an expert opinion, and we do not, the conclusion under this [criterion] was not supported by the evidence." (*J.N.*, *supra*, 23 Cal.App.5th at p. 722.)

In short, while the circumstances of an offense are key to evaluating section 707's gravity criterion, they cannot be the sole basis for concluding under the rehabilitation criterion that the minor is unlikely to be rehabilitated before juvenile jurisdiction expires. The juvenile court here misunderstood this principle by presuming from the gruesomeness of Harley's killing and the subsequent cover-up attempts that Kevin must have—despite Dr. Shields's testimony to the contrary—"a side to him that is

---

[13] The focus at the transfer hearing was on the amount of time Kevin might be able to spend in DJJ before the juvenile court's jurisdiction expired, but we note that the rehabilitation criterion is not expressly so limited. (See § 707, subd. (a)(3)(B)(i).) In other words, we see no reason that a minor's pre-disposition progress toward rehabilitation while still in juvenile hall should be discounted when evaluating the amount of time that rehabilitation in the juvenile system will ultimately require. Although Kevin does not raise a claim of error related to this focus, upon reevaluation of this criterion the juvenile court should be mindful of the time he has already spent in custody working toward rehabilitation.

34

extremely dangerous" such that "the community [could not] be safe if he is tried in juvenile court." We accept that a crime's circumstances may sometimes evince personal characteristics, such as a psychological disorder, that make a minor less amenable to rehabilitation. But without expert testimony to that effect, a court cannot reasonably infer that a minor has an amorphous "dark side" hindering rehabilitation. Otherwise, the rehabilitation criterion would be meaningless in every case in which a juvenile committed a grave crime, a result for which we discern no legislative support. The circumstances of Harley's killing were appalling, but they did not provide substantial evidence that the rehabilitation criterion favored Kevin's transfer to criminal court.

Finally, we address the appropriate disposition. Kevin seeks a writ of mandate requiring the juvenile court to (1) "set aside its order . . . transferring [his] case to criminal court" and (2) "enter a new and different order that the transfer motion be denied," but the parties' briefs do not address whether the second direction is warranted given our determination that substantial evidence supports two of the statutory criteria on which the court relied.

At oral argument, Kevin's counsel contended that we should not remand the matter to the juvenile court for reconsideration, because the court would necessarily abuse its discretion if it again decided to transfer Kevin to criminal court. Counsel argued that unless there is some evidence that a minor cannot be rehabilitated before the juvenile court's jurisdiction expires, a court cannot lawfully grant a transfer motion. Although the trend in the law is clearly toward retaining more minors in juvenile court, nothing in section 707 supports the notion that the rehabilitation criterion is now determinative regardless of the other criteria that must be considered. Thus,

35

even though the evidence of Kevin's amenability to rehabilitation in juvenile court is compelling, we are unable to say as a matter of law that "[n]o juvenile court could reasonably conclude, based on all of the evidence presented," that he should be transferred to criminal court. (*Jones, supra,* 18 Cal.4th at p. 686; cf., e.g., *J.N., supra,* 23 Cal.App.5th at pp. 720–725 [ordering superior court "to enter a new order denying the section 707 petition" where substantial evidence did not support either criterion found to weigh in favor of transfer].) As a result, we will remand the matter to the court for it to reconsider its decision.

## III.
### DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to (1) vacate its order of November 14, 2019, transferring the matter to criminal court, and thereby return Kevin to juvenile jurisdiction, and (2) reconsider its ruling on the prosecution's transfer motion in a manner consistent with this opinion. Specifically, the court shall reevaluate the rehabilitation criterion under section 707, subdivision (a)(3)(B)(i), and shall then reweigh, upon consideration of all five criteria under section 707, subdivision (a)(3), whether Kevin should be transferred to criminal court. This opinion shall be final in this court seven days from the date of filing. (Rule 8.490(b)(2)(A).)

                                              _____

                                              Humes, P.J.

WE CONCUR:


_____

Margulies, J.


_____

Banke, J.

*Kevin P. v. Superior Court*  A159680

37

Trial Court:

Superior Court of the County of Contra Costa

Trial Judge:

Hon. Barbara Hinton

Counsel for Petitioner:

Robin Lipetzky, Public Defender

Jonathan Laba, Assistant Public Defender

Diana Garrido, Deputy Public Defender

Counsel for Real Party in Interest:

Diana Becton, District Attorney

Kabu Adodoadji, Deputy District Attorney

Amici Curiae for Petitioner:

Markéta Sims, Cyn Yamashiro, Independent Juvenile Defender Program

Susan L. Burrell, Pacific Juvenile Defender Center

*Kevin P. v. Superior Court*  A159680