Filed 11/25/24  In re J.P. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | 2d Juv. Crim. B334423 (Super. Ct. No. MJ23888) (Los Angeles County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.P.,<br><br>    Defendant and Appellant. | |

J.P. appeals an order transferring him from juvenile court to a court of criminal jurisdiction.  (Welf. & Inst. Code,[1] § 707.)  We affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

FACTS

*Underlying Offense*

J.P. is a member of the South Los gang. He was in a dating relationship with D.R. On May 24, 2021, J.P. and D.R. were at D.R.'s home. Also there were two twin sisters who were friends of D.R., along with two Playboy gang members. A conflict arose between J.P. and the Playboy gang members. The sisters left.

Two days later the twin sisters were walking to a park. A van driven by D.R. approached them at high speed. J.P. was in the passenger seat. J.P. rolled down the window and yelled "South Los" at the sisters. The van drove away and returned. J.P. extended his arm out the window and fired multiple gunshots at the sisters, striking and killing one of the sisters. The surviving sister identified D.R. as the driver and J.P. as the shooter. J.P. and D.R. were arrested three days later.

At the time of the shooting, J.P. was 17 years old, four months from his 18th birthday. During the booking process, J.P. told a detective he was not worried because he would be sent to a juvenile camp and released when he turned 25 years old.

*Juvenile Record Before the Underlying Offense*

J.P. first came to the attention of the probation department when he was 13 years old. The petition charged eight counts of felony graffiti at three locations. At the time he was exhibiting behavioral problems at school. In August 2017, J.P. admitted five misdemeanors and was sent home on probation. He was ordered to participate in substance abuse counseling, anger management, and family therapy.

About two months later, probation filed a violation alleging J.P. was arguing with his teacher, not reporting to probation, and not participating in counseling. He was released on house arrest.

2

In December 2017, J.P. left home while on house arrest. The juvenile court issued a bench warrant, and J.P. turned himself in. He admitted a violation and was released on house arrest about a week later. The next week J.P. left home again and the court issued another bench warrant.

In March 2018, J.P. was placed in a program, but he left the program without permission in April. J.P. was detained and ordered to camp for five to seven months.

A camp progress report stated J.P. was participating in his services but was also engaging in gang activities, including fights. Another report stated J.P. initiated two gang-related fights.

In November 2018, the court released J.P. from camp to his mother. A month later J.P. ran away again and was again detained.

While at Sylmar juvenile hall, J.P. joined with others in doing extensive damage to the ceiling and walls by throwing chairs and kicking doors. He also tried to assault other minors. J.P. was six feet three inches tall, and the other minors were five feet nine inches tall and under.

In April 2019, the juvenile court ordered that J.P. be placed in a locked facility. While awaiting placement in the locked facility, J.P. remained detained at juvenile hall. At juvenile hall, J.P. caused disturbances, including an attempt to assault another youth.

Later in April, J.P. was placed in a locked facility where he received extensive services. J.P. continued to engage in disturbances, including numerous instances where physical intervention was necessary.

J.P. was released from the locked facility at the end of April 2020.  He was again placed with his mother, but left home about a week later.  His mother stated that J.P. got physical with her during an argument, and believed he was with his gang.  J.P. was again detained and ordered to camp.

While in camp, J.P. was charged with fighting, gang talk, and stated he would "fuck the whole camp up."  He admitted the violation and his camp placement was extended.  He was released from camp at the end of February 2021.

On May 18, 2021, a progress report stated that J.P. was doing well, and recommended termination of jurisdiction.  J.P. did not appear in juvenile court that day and a bench warrant was issued for his arrest.  J.P. murdered a young girl two days later.

*Juvenile Record After Arrest for the Underlying Offense*

In the 14 months between May 29, 2021, and July 28, 2022, J.P. was involved in 117 incidents in juvenile hall.  The incidents included 12 physical altercations, gang activity, participating in unit disturbances, threats to staff, and refusing to follow instructions.  Of the 12 fights J.P. was involved in, he was the aggressor in 11 of them.  Most, if not all of the fights, were gang related.

The final incident in juvenile hall occurred on July 24, 2022.  J.P. participated in a riot.  He picked up a trash can and hit a probation officer in the head with it.  Then he joined others in punching the officer.  J.P. punched the officer in the head or face at least once.  He later pled no contest to battery against a custodial officer and was sentenced to 16 months.  Due to the incident, J.P. was transferred to county jail.

*Time in County Jail*

J.P. made a number of telephone calls from county jail. The calls were recorded from July 2023 to the time of the transfer proceedings. During the calls J.P. talked about buying drugs. He asked his sister to relay messages so that he could "keep in contact with the hood." Among the messages J.P. asked his sister to relay was to tell "little Swifty" to get Serio "cause he's a snitch." He told his sister to tell a contact to "Los up and stay dangerous." J.P. asked his sister to send him a picture of a "K-Swiss" gang logo so he could have it tattooed on the back of his neck. J.P. told his mother the logo stood for, "Kill a [Hoover gang member]."

In another call, J.P. told his mother, "All the homies from my hood are scared of me."

J.P. told an unknown female that he got into a fight with someone from Temple Street because he "got down with Sleepy."

In a call with an unknown male, J.P. spoke about the gang tattoos he got. He got an "S" on the side of his face, "South Los" on his jaw line, and an "S" and an "L" on his legs. He said he got a K-Swiss tattoo and a "verkillamut" tattoo. J.P. said he got caught selling "spice." J.P. said, "I'm a gangster fool, I had to pay off a big ass debt."

At times during the calls, J.P. referred to himself as "shooter."

A gang expert testified the calls are significant because they show that J.P. is still committed to staying connected to the gang. The expert said "verkillamut" is a reference to Vermont, South Los's main corridor. It means if the gang saw an enemy on the gang's turf, that person would be killed.

J.P. was found in possession of a shank in the county jail.

*Personal History*

J.P.'s aunt took custody of him from his birth mother when he was a few days old. She formally adopted him about five years later. He did not know he was adopted until he turned 18 years old. J.P. refers to his aunt as his mother. J.P. has a sister who is 16 months older. He is very close to his sister.

J.P. had a normal childhood until he was eight years old when his grandmother died. His grandmother's death greatly affected his mother. His mother became more focused on men and J.P.'s relationship with his mother became strained. J.P. describes his mother as "difficult" and "drama."

J.P. would run away from his mother's home and spend time with his uncle. His uncle was a gang member and would take drugs and get tattoos with his fellow gang members. J.P.'s uncle did not push gangs and drugs on him, but J.P. decided he wanted to join a gang. He did not want to join his uncle's gang because he wanted to make his own reputation. J.P. joined a different gang at age 12.

*Defense*

Francis Guzman is an attorney and director of the National Center of Youth Law. He has been recognized as an expert in adolescent rehabilitation. He met with J.P. on three different occasions.

Guzman testified that J.P. is very insightful into his background, the issues he needs to work on, the harms he caused, and the factors that led to his behavior. Based on J.P.'s insight, Guzman testified that J.P. could be rehabilitated within the juvenile court's jurisdiction.

Monica Lujan is a licensed clinical social worker. She also met with J.P. three times. Lujan opined that J.P. can be

6

rehabilitated before the age 25 years old because he has shown the capacity to do well when his mental health and emotional needs are met, and he is in a structured, safe environment.

Kurtis Miller is a probation officer and consultant for the Secure Youth Treatment Facility (SYTF). Miller testified about the programs available at SYTF, including a mentorship program with formerly incarcerated persons, culinary classes, college classes, substance abuse program, mental health, anger management, conflict resolution, tattoo removal and gang intervention. Miller said of SYTF, "We're still in our infant stages." He was unable to say how many in the program reoffended. The program had only been going for about six months. They have no statistics to show how effective the program is.

DISCUSSION

*I. Section 707*

Section 707, subdivision (a)(1) authorizes the district attorney to make a motion to transfer to a court of criminal jurisdiction a minor who is alleged to have committed an offense listed in subdivision (b) when the minor was 16 years of age or older. Section 707, subdivision (b)(1) lists the offense of murder.

In order to transfer the minor, the juvenile court must find by clear and convincing evidence that the minor is not amenable to rehabilitation while under its jurisdiction. (§ 707, subd. (a)(3).) In making its decision the court must consider the criteria specified in subparagraphs (A) to (E) inclusive. (*Ibid*.) Those criteria are:

"(A)(i) The degree of criminal sophistication exhibited by the minor. [¶] . . . [¶] (B)(i) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's

7

jurisdiction. [¶] . . . [¶] (C)(i) The minor's previous delinquent history. [¶] . . . [¶] (D)(i) The success of previous attempts by the juvenile court to rehabilitate the minor. [¶] . . . [¶] (E)(i) The circumstances and gravity of the offense alleged to have been committed by the minor."

If the juvenile court orders a transfer of jurisdiction, the court must recite the basis for its decision in an order entered upon the minutes. (§ 707, subd. (a)(3).)

## II. Basis of Decision Entered onto the Minutes

J.P. contends the juvenile court's minutes do not properly recite the basis for the court's decision.

J.P. points out that section 707, subdivision (a)(3) requires that if the juvenile court orders transfer of jurisdiction, the court must recite the basis for its decision "in an order entered upon the minutes." J.P. does not contest that the court made a thorough analysis of the criteria required as a basis for its decision orally on the record. J.P.'s only complaint appears to be that the court's oral analysis was not reflected in the minutes.

We decline to remand the matter to the juvenile court so that it can perform the administrative task of transferring its oral statements into the minutes. The reason for the requirement that the minutes reflect the basis for the decision is to permit meaningful review. (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1028.) We are entirely capable of reviewing the basis for the juvenile court's decision from the reporter's transcript even if it is not reflected in the minutes. The error was harmless by any standard.

## III. Substantial Evidence

J.P. contends the juvenile court's decision is not supported by substantial evidence.

8

In *Conservatorship of O.B.* (2020) 9 Cal.5th 989, our Supreme Court stated the standard of review for sufficiency of the evidence is where the burden of proof is by clear and convincing evidence.  We review the record in a light most favorable to the prevailing party.  (*Id.* at p. 1011.)  We give deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.  (*Id.* at pp. 1011-1012.)  We must determine whether the record as a whole contains substantial evidence from which a reasonable finder of fact could have found it highly probable that the fact or facts were true.  (*Id.* at p. 1011.)

## *(a) Criminal Sophistication*

J.P. argues that extending his arm outside a moving van and firing multiple shots does not show criminal sophistication.

But J.P. ignores the context.  The murder was not an unthoughtful act.  J.P. saw the two sisters, left the scene, armed himself, and returned to shoot at them multiple times.  It was a willful, deliberate and premeditated murder.  J.P. did not act under the influence of drugs or alcohol.  He did not suffer from mental illness or low intelligence.  He did not act under adult or peer pressure.  J.P. was entirely self-motivated.  He did not show remorse for the murder.  In fact, J.P. appeared proud of what he did, adopting the moniker "shooter" and bragging that people in his neighborhood were afraid of him.

## *(b) Previous Delinquent History*

J.P. has an extensive delinquent history, beginning when he was 13 years old.  It began with felony vandalism, but it quickly escalated to violence.  He initiated almost all of the numerous fights he was involved in.  The violence was against

9

minors much smaller than he was. In addition, J.P. threatened staff, escaped, and intentionally damaged the juvenile facilities where he was housed. Finally, J.P. committed a battery on a peace officer. The authorities determined he was too violent to be housed in a juvenile hall and transferred him to county jail.

The juvenile court carefully considered J.P.'s family and community environments, and reasonably concluded his juvenile delinquent history supported the transfer to criminal court.

*(c) Previous Attempts to Rehabilitate*

J.P. has received years of services, including those addressing mental health and substance abuse. He failed to respond positively to the extensive provision of services. If anything, he has gotten worse. J.P. proved too violent to remain in juvenile hall. Nothing in J.P.'s behavior indicates that the provision of even more services will rehabilitate him within the jurisdiction of the juvenile court.

*(d) Circumstances of the Gravity of the Offense*

Here the offense was an unprovoked, willful, deliberate, and premeditated murder of an unarmed girl. Not only did J.P. take a girl's life, but he also placed her sister in mortal danger. The residual effects are severe. The victim's sister must live with the life-long trauma of seeing her sister murdered in her presence. The victim's family and friends must live with a devastating loss.

*(e) Rehabilitation Prior to the Expiration of the Juvenile Court's Jurisdiction*

The ultimate question is whether the minor is amenable to rehabilitation while under the jurisdiction of the juvenile court. Overwhelming evidence leads to the conclusion that he is not amenable. He has shown no remorse or resolve to reform. To the

10

contrary, he appears proud of the murder, identifying himself as "shooter." He added tattoos to his body that show his willingness, if not his eagerness, to kill again. He boasted that people in his neighborhood are afraid of him. Juvenile authorities determined that he is too violent to be held in juvenile hall. County jail authorities found J.P. in possession of a shiv.

J.P.'s telephone calls from county jail show he is still deeply involved with his gang. He shows no desire to stop or even diminish his involvement. In fact, the name of his gang was tattooed on his face.

Years of services have done nothing to improve J.P.'s behavior. In fact, it has grown worse despite the services. There is nothing to suggest that more services will be effective.

The trial court's thorough order transferring J.P. from juvenile court to a court of criminal jurisdiction is well supported by clear and convincing evidence.

## DISPOSITION

The judgment (order) is affirmed.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

YEGAN, J.

BALTODANO, J.

11

Susan Ser, Judge

Superior Court County of Los Angeles

_____

Law Office of Christine M. Aros and Christine M. Aros, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.